[No. S004727. Apr. 30, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICIO RODRIGUEZ SILVA, Defendant and Appellant.

346

**COUNSEL**

Fern M. Laethem and Lynne S. Coffin, State Public Defenders, under appointment by the Supreme Court, Joel Kirshenbaum, Kathleen M. Scheidel, Jamilla Moore and William T. Lowe, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell, J. Robert Jibson

and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant Mauricio Rodriguez Silva appeals from a judgment of death upon his conviction by jury verdict of two counts of first degree murder (Pen. Code, § 187),[1] with the multiple-murder special circumstance (§ 190.2, subd. (a)(3)), and one count of second degree murder (§ 187). After the first jury was unable to reach a verdict on the issue of penalty for the first degree murders with a special circumstance, the case was retried as to penalty, and a different jury returned a penalty verdict of death. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We will affirm the judgment as to guilt and special circumstances, but, because of serious error in the selection of the jury that returned the penalty verdict, we will reverse the judgment as to penalty.

### FACTS AND PROCEEDINGS

Within three weeks after being paroled from state prison, where he had been serving a sentence for voluntary manslaughter, defendant killed three more people: Walter Sanders, Monique Hilton, and Martha Kitzler. Defendant killed Sanders and Hilton with a shotgun; he strangled and stabbed Kitzler. The killings all occurred in Los Angeles County. Defendant surrendered in San Luis Obispo County and confessed to these homicides. At trial, defendant did not dispute that he had killed the three victims. The disputed issues largely concerned his mental states and the existence of mitigating circumstances warranting a punishment other than death.

A. *Prosecution's Guilt Phase Case-in-Chief*

On May 7, 1984, defendant was released on parole from the state prison at Soledad, California, where he had been serving a sentence for a 1978 voluntary manslaughter conviction. After his release, defendant withdrew around $7,000 in cash from his bank account in Los Angeles, apparently Social Security benefits defendant had received after his father's death. Defendant intended to obtain employment on a ranch in the Palmdale-Newhall area, but he changed his mind when he thought about how strenuous the work would be. While traveling on a bus, defendant met Walter Sanders, a 16-year-old runaway from Lompoc, California.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Around May 15, 1984, defendant and Sanders arrived by bus in Sylmar, California, where they visited Victoria Ventura, a friend of Sanders. Ventura took them to a used car lot where defendant bought a small station wagon. Sanders spent the night with Ventura, and defendant returned the next day to pick him up.

Around May 19, 1984, defendant and Sanders arrived in the station wagon at Peggy Ashley's home in Lompoc. Sanders used Ashley's telephone to call his mother, who lived nearby. Sanders's mother came to Ashley's house, bringing Sanders about $40 in cash and some clothing. Sanders told his mother that he would return in June after finishing a job loading trucks.

Around the same time, defendant and Sanders visited Faith Craft at her home in Lancaster, and they invited her out to eat. As they were driving to a local restaurant, Craft saw a gun and handcuffs in defendant's station wagon.

On May 22, 1984, the body of Walter Sanders was found near the California Aqueduct on a dirt road in the Antelope Valley. He had been shot five times with a shotgun. The wounds were to the chest, the face, the back of the head, the right side of the back, and up the rectum. It appeared that the shots had been fired in that order, with the shots becoming progressively closer in range. Sanders was apparently standing during the first three shots and lying down during the final two. Multiple shotgun wounds caused his death.

Defendant spent the weekend of May 26 and 27, 1984, in Hollywood at a house owned by his 17-year-old half sister, Martha Kitzler. Defendant and Kitzler had the same mother, who had died in an automobile accident in 1972, but different fathers. Also living in the house with Kitzler were defendant's uncle, Carlos Rodriguez, and Rodriguez's wife and two children. Under the mattress in her bedroom, Kitzler had $2,700 in cash, the proceeds of the sale of her car. Kitzler had told Rodriguez that defendant was jealous of her boyfriend, Flavio Alvarez. On Monday morning, May 28, 1984, Rodriguez asked defendant to leave the house because he did not want defendant to be there with Martha and his wife. Defendant was gone by 11:00 a.m., when Rodriguez left the house. The other occupants of the house, except Kitzler, all left before noon.

That same morning, Flavio Alvarez telephoned Martha Kitzler. Saying she was about to take a shower, Kitzler asked him to pick her up around noon so they could go to lunch together. When Alvarez came to Kitzler's house at noon, he noticed defendant's station wagon parked outside with the motor

running, and defendant answered his knock on the door. Defendant said that Kitzler was in the shower. After Alvarez entered the house, defendant left, saying: "Don't do anything I wouldn't do." Defendant then got in his car and drove away. Alvarez knocked on the door of Kitzler's bedroom. Receiving no answer, he opened the bedroom door and found her body on the bed. When he removed a towel that covered her head and clothing that had been placed over her body, he observed stab wounds and immediately notified the police.

Martha Kitzler's bedroom appeared to have been ransacked, but her money was still under the mattress. Asphyxia, possibly by manual strangulation, caused Kitzler's death. Stab wounds on her torso and neck were inflicted after death. Abrasions in her vagina were inflicted at the time of or within 24 hours before death.

On the same day, May 28, 1984, the badly decomposed body of Monique Hilton was found on a dirt road in the Antelope Valley. She had been shot four times with a shotgun and had been dead for at least two days. The wounds were to the head, head and neck, right side of the chest, and the back of the body. Multiple shotgun wounds caused her death.

During the afternoon of May 28, 1984, defendant placed a series of telephone calls to Anita Rinker, whom he had never met in person, but to whom he had spoken over the telephone once or twice a month since 1980, when he had called her number by mistake. Defendant told Rinker that he had killed three people. He described where he had left the bodies, and he asked her to give this information to the police. Rinker tried to persuade defendant to surrender, but he was reluctant to do so because he feared that he would be put to death for these crimes. Rinker suggested that defendant could plead insanity, but defendant replied that he was not insane.

Around 9:00 that evening, defendant rang the doorbell at the sheriff's substation at Templeton in San Luis Obispo County. He told Deputy Candy Marie Jones, who opened the door, that he wanted to turn himself in, that he had killed three people, and that the weapons he had used—a gun and a knife—were inside his car. After taking defendant into custody, Deputy Jones confirmed that a knife and a shotgun were in defendant's station wagon, which was parked in the lot next to the sheriff's station. She transported defendant to the county jail, from which he was released into the custody of the Los Angeles Police Department. When he was taken into custody, defendant had around $80 remaining from the $7,000 he had withdrawn from the bank three weeks before.

Tests of the shotgun found in defendant's car revealed that it had fired expended shotgun shells found near the bodies of Walter Sanders and Monique Hilton.

During tape-recorded interviews by investigating officers on May 29 and 30, 1984, defendant described the circumstances of the three killings.

Regarding the killing of Walter Sanders, defendant said he met Sanders on the bus near Sylmar. Defendant pretended he was in the military and was on his way to a party in Los Angeles. Sanders asked to go with him, and defendant agreed. After they got off the bus in downtown Los Angeles, defendant admitted that he had recently been released from prison and was running from parole. Sanders said he was running away too, and they agreed to become crime partners. They decided to travel together by bus to New York, where they planned to support themselves by robberies and other crimes. When they reached Arizona, however, they changed their plans and eventually returned to California. Defendant bought the shotgun while Sanders was staying with Victoria Ventura in Sylmar. Sanders wanted to test the gun, so defendant drove out to the desert. Defendant fired one shot, and then Sanders wanted to fire the gun also, but defendant did not trust him. They argued about the gun and about defendant's lack of trust, and then defendant shot Sanders.

Regarding the killing of Monique Hilton, defendant said that after he killed Sanders, he returned to Los Angeles. He picked up Hilton early one morning as she was hitchhiking on Santa Monica Boulevard. When she got in the car, she told defendant she was hungry and had no money. After buying her some food and some clothing, defendant wanted to leave her, but eventually he agreed to let her accompany him to the Lancaster-Palmdale area, where they rented a motel room. Hilton offered to have sex with defendant, but he declined because she said she was having her period. They left the motel, and defendant drove down a dirt road and stopped the car. He told Hilton he did not believe that she had no money, and he demanded that she show him her money. When she again denied that she had any money, he picked up the shotgun from the backseat and told her to get out of the car. She walked away and then turned around. She told defendant to look in her bag, where he found the key to a motel room in Hollywood. As she was walking back to the car, defendant shot her.

Regarding the killing of Martha Kitzler, defendant said that on the morning of May 28, 1984, Kitzler had sent him to the store to buy shampoo and conditioner for her. When he returned, he found Kitzler alone in the house. After he gave her the shampoo and conditioner, she told him to leave, and that made him angry. He accused her of not trusting him and of treating him like a stranger. He told her she was the only one he had left, besides his brother David, because the other members of his family did not care for him. She said she did not care for him either because he had wasted his life in

prison. Defendant then went out to his car and brought back his knife, intending to kill Kitzler, but he put the knife down inside the house before Kitzler saw it. He told Kitzler he should kill her because of the way she was treating him. Kitzler "started talking shit" and defendant threw her down on the bed and slapped her. Defendant started choking her with his hands and she turned blue. Then defendant got the knife and stabbed her. After she was dead, he tried to move the body to the shower but then changed his mind and covered the body with clothing and a towel. He rinsed the knife, took it outside, and threw it into the back of his car. He remembered that she had money from selling her car, and he started to look for it by going through the drawers in her bedroom, but then the doorbell rang. It was Kitzler's boyfriend, Flavio Alvarez. Before answering the door, defendant checked his own clothing and saw that his shirt had blood on it, so he removed it. He also turned the shower on, so Alvarez would think that Kitzler was taking her shower. After letting Alvarez into the house, defendant got in his car and drove away.

## B. *Defense Case at the Guilt Phase*

The defense called no witnesses and offered no exhibits at the guilt phase.

## C. *Guilt Verdicts*

The jury convicted defendant of second degree murder as to Walter Sanders and of first degree murder as to Monique Hilton and Martha Kitzler. The jury found that defendant used a firearm (a shotgun) to murder Sanders and Hilton, and that he used a deadly weapon (a knife) to murder Kitzler. The jury found the multiple-murder special-circumstance allegation true, and it also found true allegations that defendant had previously been convicted of voluntary manslaughter and assault by a prisoner, for each of which crimes he had served a separate term of imprisonment.

## D. *Penalty Phase Evidence*

After the first jury was unable to reach a verdict as to penalty, the penalty phase was retried. At the penalty retrial, the prosecutor again presented evidence concerning the murders of Walter Sanders, Monique Hilton, and Martha Kitzler. This presentation included additional evidence intended to show that defendant had raped Kitzler before he killed her.

Investigating officers testified that when Kitzler's body was discovered, the position and condition of her clothing, with the breasts exposed and the sweat pants down far enough to expose the buttocks and some pubic hair,

suggested the possibility of rape. There were bloody stains on the victim's left upper thigh, under the sweat pants, in the shape of fingertips. A clear thick fluid was found around the victim's navel, but on testing it proved not to be semen.

The autopsy of Kitzler's body revealed three fresh superficial abrasions in the bottom part of the vagina, consistent with the forcible insertion of a penis. Swabs of Kitzler's mouth and vagina tested positive for P-30, a protein from the male prostate gland, indicating the presence of semen, although no sperm was detected. The blood type of the semen donor could not be determined. A swab of Kitzler's right nipple tested positive for amylase, a constituent of both saliva and sweat. The sweat or saliva was from a person with blood type B who was a secretor (a person whose blood type can be determined from bodily fluids other than blood, such as sweat, semen, and saliva). Defendant, like 15 percent of the population, is a type B secretor, whereas Kitzler had blood type A.

The prosecution also presented evidence of other criminal conduct by defendant.

In July 1976, while a prisoner at a maximum security facility of the California Youth Authority, defendant set fire to a mattress in his cell.

On January 7, 1978, defendant picked up two hitchhikers, 16-year-old Johnnie G. and 18-year-old Troy Crovella, who were on their way to visit Crovella's girlfriend in San Diego. Defendant took them to the girlfriend's house, but she was not home. Eventually they decided to hunt jackrabbits. Defendant bought a .22-caliber rifle and ammunition at a San Diego pawnshop, and he drove to a desert area near the cities of Palmdale and Lancaster. They rented a motel room and drank alcohol. Defendant and Crovella decided to shoot at the tires of passing cars. At dusk, they drove into the desert, and defendant stopped on the side of a road. G. remained in the car because he did not want to be involved. Defendant and Crovella walked away, and a few minutes later G. saw flashes he thought were from gunfire. Defendant returned alone, telling G. that after they hit a car Crovella became scared and ran back to the motel. They returned to the motel without finding Crovella. G. told defendant that he had telephoned his mother earlier and had given her the license plate number and a description of defendant's car. G. said his mother would report this information if G. did not return within another hour and a half. Defendant seemed upset, but he agreed to drive G. to Los Angeles. They stopped about midway in the journey because G. needed to urinate. As G. was returning to the car, defendant tried to kiss him on the face and to "grope" him. G. backed away and got into the car. A while

later, in Culver City, G. asked defendant to stop the car, saying he was sick. G. got out, ran away, and reported the incident to the police.

Sheriff's officers found Crovella's body in the area indicated by G. Crovella had been shot in the head, neck, shoulder, arm, leg, and lower back. At least nine bullets, all apparently .22-caliber, had struck him, of which at least five inflicted wounds that would have been independently fatal. When arrested, defendant said he shot Crovella because he became angry after Crovella made sexual advances and fired the rifle at defendant. Defendant remarked that he should have killed G. as well. On October 26, 1978, defendant pled guilty to voluntary manslaughter for killing Crovella.

On September 16, 1979, defendant and Ernest Kelly were inmates at the same state prison. Kelly and defendant entered Kelly's cell, where Kelly had agreed to help defendant with some legal papers. Defendant slammed the cell door, which locked automatically. When Kelly tried to move toward the door to call for a guard to open it, defendant blocked his way and began to strike him. Defendant said, "I'm going to fuck you." Although much smaller than defendant,[2] Kelly attempted to fight back. Defendant grabbed at Kelly's belt, apparently trying to remove it. Defendant hit Kelly on the side of the head with a glass jar that he took from a shelf in the cell. Guards arrived to rescue Kelly, who received stitches inside one ear and suffered permanent hearing loss. For this incident, defendant pled guilty to assault by a state prison inmate (§ 4501) on October 23, 1979.

The defense presented evidence of defendant's life history.

Defendant's mother was born in Nicaragua as Myrna Rodriguez. She came to the United States around 1950. She lived in Los Angeles, where she met David Silva, defendant's father, who was born in Mexico. They married in 1956. They had two children: defendant's older brother (named David like his father) and defendant. Defendant was born in October 1959 with a cleft palate, making his speech unclear. During the marriage, while defendant's father was at work, defendant's mother often went visiting in the neighborhood, leaving defendant and his brother, both under the age of five, alone in the house. Defendant's parents separated and divorced around 1960 or 1961. At first his mother had custody of defendant and his brother. Later, around 1962 or 1963, defendant lived with his mother's sister, Clarisa Bernheim, at her Los Angeles home.

Around 1963 or 1964, when defendant was four or five years old, defendant's father, David Silva, took defendant and his brother to live for a few

---

[2]When interviewed by police in May 1984, defendant said he was six feet five inches tall, weighed 220 pounds, and in prison had bench-pressed about 500 pounds.

months with their grandmother, Josefina Acosta Silva, in Mexico City. Several times, Josefina left defendant and his brother alone in the house, with the door padlocked from the outside. Josefina and other family members always ate in the dining room, but she made defendant and his brother eat in the kitchen, like servants. They were thin and had no toys to play with. Josefina did not read to them and never showed them any affection. Because defendant had an unusual physical appearance, and his speech was difficult to understand, the children in the neighborhood teased him.

Defendant lived with Josefina in Mexico City again from 1966 to 1968. As before, Josefina often went away and left defendant alone, locked inside her apartment, sometimes for several days. Defendant would sit at the window and complain of hunger to friends outside. Josefina kept padlocks on the refrigerator and on all cabinets that contained food. Defendant sometimes had bruises on his body. He never went to school, and he received no instruction at Josefina's apartment. Defendant did not have a bedroom and slept on the floor. Defendant started running away from Josefina's apartment.

In May 1967, defendant's mother, who was then living in Los Angeles, gave birth to Martha Kitzler, defendant's half sister. Martha's father, who never married defendant's mother, bought a house for Martha and defendant's mother to live in.

Defendant's father, who was then living in Alaska, sent money to Josefina every month for defendant's care. In the spring of 1968, he and his new bride came to visit defendant and Josefina in Mexico City for two weeks. While they were there, defendant ran away once and was gone for not more than two days. When defendant's father and stepmother asked about the locks on the refrigerator and food cabinets, Josefina said she did not want defendant to eat all the food. As she had done during defendant's earlier stay with her, Josefina showed no affection for defendant, and she made him take his meals in the kitchen.

Defendant's father was killed in Alaska in July 1968. After he learned that his father had died, defendant, who was then nine years old, ran away from Josefina for good. Josefina went to Alaska for the funeral of defendant's father, but defendant, who was then living on the streets, had no opportunity to attend the funeral.

In November 1968, a juvenile court in Mexico adjudged defendant a vagrant and committed him to a prevocational school, where defendant remained until March 1969. The director, a Catholic priest, recalled defendant as a quiet and lonely child, with a speech impediment, who did not play with the other children.

In April 1970, defendant returned from Mexico to live with his mother in Los Angeles. But he frequently ran away and started shoplifting, stole a car, and was placed in a juvenile facility in Sylmar for three months. One staff member at Sylmar recalled defendant as a very cooperative child with a speech impediment that made him a target for older, more sophisticated children.

Defendant's mother said she could not control him, so he was placed in a foster home. When he ran away from the foster home, he was placed in a facility in Corona named Good Samaritan, but he stole a staff member's car and drove off.

In March 1971, the juvenile court placed defendant at Showers School for Exceptional Children, a private facility in the desert east of Oceanside for mentally retarded children, most of whom were also emotionally disturbed. Defendant remained there until October 1971, and apparently he was later returned there for an additional month or two. While there, defendant complained of headaches two or three times each week. To the staff, defendant appeared to be frightened and quiet, unable to play or interact with other children, but he did not receive any therapy for his emotional problems. His reading ability was below first grade level, but his intelligence was greater than the tests indicated. He was educationally and socially unsophisticated, but streetwise. He had very low self-esteem. He ran away from the school three or four times, usually by stealing a car.

Defendant's mother died in an automobile accident in March 1972 when defendant was about 13 years old.

Around this same time, defendant telephoned a bank and threatened to harm someone if money was not brought to him at the telephone booth from which he had placed the call. Defendant was arrested at the booth. His probation officer interpreted this behavior as an act of "extreme desperation" and recommended placement in the Youth Authority because it provided security and an opportunity for therapy. Instead, the juvenile court placed him in another foster home, this time with the Clinkscales, a couple who owned a small farm in the Antelope Valley.

While defendant was at this foster home, he attended public schools in Lancaster. He was first placed in an eighth grade class, then moved to a seventh grade class, and finally to a class for the educable mentally retarded (EMR). Peggy Foster testified that she drove the bus that defendant rode to and from school and also supervised him on the school playground. She remembered defendant as a likable child who always followed instructions.

His speech was difficult to understand, and other children teased him. Patricia McMurrin testified she worked as a nurse at the same school. Defendant's large size, large head, large hands, and prominent jaw suggested to her that defendant might have acromegaly, a glandular disorder involving an excess production of growth hormone. She suggested to the Clinkscales that defendant be medically examined for this condition. McMurrin observed that other children frequently teased defendant at school, called him "big head and mush mouth." When this happened, defendant became angry and verbally aggressive.

Elizabeth Day, one of defendant's classmates in the EMR class, recalled that defendant wore clothes that were torn and did not fit him. They seemed more like work clothes than school clothes. Defendant's hair was cut very short, and he always wore a beanie. Other children teased defendant, and this made him angry, but he never hurt them. His teacher in the EMR class, Claudia Perkins, testified that defendant was unable to write his name or to recognize the letters of the alphabet. Defendant was socially isolated, had very low self-esteem, and often complained of headaches. He was the only student she ever taught who refused to draw pictures of his family. Once when they were discussing mothers, defendant said, "I don't have one of those."

Around this time, defendant's probation officer assigned his case to a student professional worker, Erna Hope, who arranged for the surgical repair of defendant's cleft palate. Hope testified that she regarded the surgical repair as essential because, in a child, a disability like cleft palate causes social isolation, low self-esteem, introversion, anger, and resentment. Defendant was then 12 or 13 years old, and cleft palates are usually repaired at a younger age. Hope's only personal contact with defendant was in March 1973 when she took him for evaluation to the University of California at Los Angeles Medical Center. Based on this contact, and her review of defendant's file, Hope did not think defendant's placement in the foster home was appropriate because defendant needed social and therapeutic intervention and an enriched environment.

In March 1973, the medical center's evaluation team found that defendant's palate had scars from an earlier surgical repair that had not cured the speech problem. Another surgical repair was successfully performed in September 1973. Defendant was supposed to return for further evaluation after this surgery, but he did not.

During the following years, placement for defendant became increasingly difficult. The juvenile court did not follow the probation officer's recommendation for placement in the Youth Authority, and other facilities either

declined to accept him or were not suitable. On one occasion, the court ordered placement at Los Angeles County General Hospital, from which defendant immediately ran away. On another occasion, the court terminated the wardship and released defendant to the streets because no suitable placement was available.

Richard Gonzales was a youth counselor at the Youth Training School in Chino in July 1976 when defendant set fire to the mattress in his cell. Gonzales assisted in extinguishing the fire and in obtaining medical treatment for defendant, who had sustained serious burns on his face and hands. Defendant was in great pain, but he did not receive any treatment for more than six hours. Defendant asked whether his family would be notified about the burns, and defendant remarked that now they would have to visit him. Defendant also said that before he set the fire he had been suffering from a headache, but the staff would not give him any aspirin or other medication. During the night, defendant placed a telephone call to his brother to ask his brother to visit him. The brother promised to visit defendant but abruptly ended the conversation, explaining that he wanted to watch a television program. Defendant then began to cry. Defendant continued to cry in the back of the van as Gonzales drove him to the hospital.

On December 6, 1976, defendant was paroled from the California Youth Authority and placed in Rogers Social Rehabilitation, a residential care home run by Maxine Rogers for children from the Youth Authority who were mentally disordered or developmentally disabled. It was regarded as a placement of last resort for children with very difficult problems. Rogers was concerned that the materials she received from the Youth Authority did not include a psychiatric report on defendant. She noticed that defendant was very paranoid about his appearance and very fearful that people would harm him. Rogers thought defendant needed extensive therapy, but his parole officer, a man named Lambert, refused to authorize therapy for defendant. Rogers arranged for defendant to be evaluated by the University of Southern California Medical Center, but Lambert refused to follow the center's recommendations.

Lambert removed defendant from Rogers's home on December 29, 1976, because he thought the placement was too expensive and Rogers was asking for too much treatment for defendant. Defendant was again placed in Rogers's home on March 11, 1977. Rogers observed that defendant was very depressed but seemed happy to be at her home again. Lambert removed defendant from Rogers's home once more around March 26, 1977, again because of the expense. Lambert then placed defendant in a rest home with elderly people. Defendant phoned Rogers every day from the rest home,

complaining of the lack of supervision. Defendant would cry during these calls. Rogers thought at that time that defendant needed a lot of therapy and was not receiving any. Rogers asked Lambert to remove defendant from the rest home and place him in a facility with more structure. A short time later, defendant was back in the Youth Authority.

At the Youth Authority, Harold Safford, a staff psychologist, evaluated defendant twice during 1977. At the first evaluation, Safford concluded that defendant was not mentally ill, but he was impulsive and developmentally disabled, he had low self-esteem and very poor judgment, he lacked insight into the reasons for his behavior, and he had no ability to foresee the consequences of his own behavior. At the second evaluation, Safford concluded that defendant "showed no ability to make a reasonable judgment and that nothing that had happened in his contact with the criminal justice system had made any difference in his ability to change his behavior." He recommended that defendant be either permanently institutionalized or paroled to a closed institution that he could leave only when accompanied by a "socially adept person." Safford had never before or since made a similar recommendation for any other ward he had evaluated. He found defendant unique in lacking any capacity to learn from experience.

On November 14, 1977, defendant was paroled from the Youth Authority and for the third time placed in Rogers's home. As before, Rogers observed that defendant seemed very depressed but happy to be back in her care. She also found that defendant "was anxious to have therapeutic treatment," but his parole officer, Lambert, said that defendant had received enough treatment at the Youth Authority. Rogers arranged for another psychiatric evaluation of defendant at the University of Southern California Medical Center. Defendant told Rogers that he thought he should be locked up in the Youth Authority, a remark that Rogers regarded as very significant. Lambert removed defendant from Rogers's home around the first week of December 1977.

In January 1978, defendant approached a priest, Father Hugh Crowe, after mass at a Catholic church in Los Angeles and asked to go to confession. Father Crowe brought defendant to the rectory, where defendant confessed he had shot and killed a young man in the desert near Lancaster. Defendant said that he and the victim had gone to the desert to shoot rabbits, but then they had quarreled over the rifle. Father Crowe testified that defendant seemed sincerely remorseful for this deed, but he would not agree to surrender himself to the police. Later, Father Crowe visited defendant in prison, and defendant expressed a desire to join a religious order and become a monk. Later still, in October 1984, Father Crowe visited defendant in jail

while defendant was awaiting trial for these capital offenses. At first, defendant seemed very discouraged and indifferent as to whether he lived or died. In later visits, defendant's mood improved. Defendant expressed remorse for the three later killings, and Father Crowe formed the opinion that he would improve himself and become a better human being in prison.

In 1980, while incarcerated in the protective housing unit at Soledad prison, defendant attended Catholic services each week and met Father Lawrence Kambitsch, one of two Catholic chaplains at Soledad. During this time defendant had no visitors except a priest from Los Angeles. At first, defendant would not read Bible passages during the services, and Father Kambitsch learned this was because defendant was unable to read. Eventually, defendant taught himself to read and participated in the services. Defendant told Father Kambitsch that after his release he would like to either help children or join a monastery. Father Kambitsch helped defendant make contacts with some monasteries to obtain information about their entrance requirements.

In late 1981 or early 1982, while imprisoned, defendant telephoned a Benedictine monastery in Antelope Valley. Defendant spoke to Father Francis Benedict about becoming a monk. Father Benedict encouraged defendant, and defendant began to telephone "every couple of months" for more information. Father Benedict formed the impression that defendant sincerely wanted to do something worthwhile with his life, to serve God. In May 1984, on a Sunday after his release from prison, defendant telephoned Father Benedict to arrange a visit. Father Benedict invited defendant to come straightaway. Defendant arrived after dark, hours later than Father Benedict had expected him, and defendant seemed uncomfortable and less enthusiastic. Because of the lateness of the hour, Father Benedict told defendant that he could stay overnight at the monastery and that in the morning they would talk. Defendant was shown to a room, but he left without spending the night.

On May 8, 1984, the day after he was released on parole, defendant reported to the parole office in Los Angeles, where he signed a document reciting the terms of his parole. One of these terms required defendant to attend an outpatient psychiatric clinic for evaluation. Defendant needed a referral slip to take to the clinic, and he was told to report to the parole office again on May 15, when he would receive the referral slip. Defendant did not report on May 15, and on May 18 defendant telephoned the parole office and asked if a warrant had been issued. When told that no warrant had issued, defendant said something about not being able to live on the outside, and he asked that a warrant be issued if he did not report in person that day. Defendant did not report in person that day, and a warrant was eventually

issued, two or three days before defendant's arrest, but it "did not get into the system, so it was cancelled." Normally a warrant is issued only when a parolee has been missing for 30 days.

Shlomo Meled, a physician with a specialty in endocrinology and a professor at the University of California at Los Angeles School of Medicine, testified that, after examining defendant at Cedars-Sinai Hospital, including the results of a CAT scan performed in January 1985, and after reviewing defendant's medical records, he was of the opinion that defendant had an extremely rare condition. A tumor developed in defendant's pituitary gland, at the base of his brain, probably when he was around one year old, causing oversecretion of growth hormone and producing a condition known as gigantism. Such tumors frequently press against the optic nerve and the hypothalamus, causing loss of peripheral vision, migraine-like headaches, excessive hunger, and severe mood swings. Tests of defendant's blood in 1974 and 1976 had shown growth hormone levels far above normal. In 1985, however, defendant's growth hormone level was normal, indicating that the tumor was no longer active and probably no longer existed.

Franklin David Rudnick, a psychiatrist and the medical director of a neuro-behavioral clinic at the University of California at Los Angeles, testified that defendant was evaluated at the clinic, apparently while awaiting trial in this case. Testing revealed a functional abnormality of the left temporal lobe of defendant's brain, which is the sort of abnormality that is associated with violent behavior. When interviewed by Rudnick, defendant said that when he was a child his grandmother had hit him with pots and pans; this kind of trauma to the head could have caused the abnormality. Dr. Rudnick also testified that defendant's medical records indicated the presence of a pituitary tumor that had since become inactive, and that a pituitary tumor, if it presses against a temporal lobe, may also make a person prone to rage and violent behavior.

Michael Healy, an educational psychologist who specialized in emotionally and behaviorally disturbed children, testified that in his extensive experience he had never encountered another individual with as many physical handicaps, deprivations, and rejections as defendant. According to Healy, the unrepaired cleft palate was a devastating thing for defendant because it interrupted normal language development. His parents' inability to deal effectively with his cleft palate and his gigantism caused defendant to withdraw and become isolated. Rejection by his peers caused defendant to become frightened and distrustful of others. Being kept out of school for years, being emotionally and perhaps physically abused by his grandmother, and being erroneously placed in a class for the mentally retarded all further

contributed to his low self-esteem and interfered with normal social development.

In addition to the evidence about defendant's life history, the defense presented forensic evidence relating to the death of Martha Kitzler. Criminalist Lynne Herold of the Los Angeles County Coroner's Office testified that she assisted in collecting evidence from the body of Martha Kitzler. When she removed Kitzler's clothing, a bloodstained wad of toilet tissue fell out of the panties.

David Sugiyama, a criminalist employed by the defense, obtained this tissue and tested it. The tissue was stained with type A blood, consistent with Martha Kitzler's blood type. No sperm were observed and testing for P-30, a protein from the male prostate gland, was negative, indicating an absence of semen. Sugiyama retested the vaginal swabs taken from Kitzler's body and, unlike the prosecution's criminalist, he detected no P-30. He then reviewed the gel that the prosecution's criminalist had produced from the swabs and did not observe "any clear-cut banding." Although it was "a real difficult call to make," he concluded that this gel did not show P-30.

On rebuttal, defendant's grandmother, Josefina Acosta Silva, testified that while defendant was living with her in Mexico City, she treated him like a son, hired a tutor to educate him, gave him toys to play with, never left him alone in the house, did not deny him food, and did not lock her cabinets or refrigerator. Michael Maloney, a clinical psychologist, testified that defendant is "of low intelligence," but he is "not technically mentally retarded." Defendant is not psychotic, but he may have borderline personality disorder. Defendant may have been in a rage when he killed Walter Sanders and Martha Kitzler, but Maloney was less certain about defendant's mental state during the murder of Monique Hilton. Defendant seemed sincerely remorseful, particularly regarding Kitzler's murder.

## ISSUES RELATING TO GUILT

### I. *Motion to Replace Public Defender with Private Attorney*

On November 14, 1984, Los Angeles Superior Court Judge Douglas A. McKee held a pretrial status conference, at which Deputy Public Defender Michael O. Clark, defendant's appointed trial counsel, announced that defendant "would like to have a *Marsden* motion." (See *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) After the prosecutor left the courtroom, defendant then submitted a document, apparently written by another inmate at defendant's direction, stating reasons for defendant's

dissatisfaction with counsel. The document stated that counsel had advised defendant to waive his statutory speedy trial rights because without a waiver the matter would be transferred to Judge (now Chief Justice) Ronald George, and counsel had also advised defendant that Judge George would probably treat defendant unfairly. After reading the document, the court asked defense counsel to leave the courtroom, and in his absence explained that counsel was correct that without a time waiver the matter would have to be transferred to Judge George for assignment because Judge McKee was then presiding over another trial that had not yet concluded. Judge McKee said that if the case was transferred to Judge George for assignment, there was no way to predict which judge would ultimately preside over the trial and he had no reason to think that the judge who ultimately presided over defendant's trial would treat him unfairly. Judge McKee said he himself had formed no opinion on the merits of defendant's case and if he presided over the trial he would try to be fair. Judge McKee asked defendant if he had any other complaints, and defendant alleged that counsel had told a witness at the preliminary hearing that defendant would get the death penalty and that counsel seemed to be preparing only for the penalty phase and not for the guilt phase.

Judge McKee then had defense counsel return to the courtroom to respond to defendant's allegations. Counsel said he had told a witness at the preliminary hearing that the prosecution "probably would seek" the death penalty, and that he had never told anyone that defendant "was going to get" the death penalty. Counsel said he planned to contest guilt but in view of defendant's confession, other incriminating evidence, the abolition of the diminished capacity defense, and the time pressure caused by defendant's insistence on a speedy trial, he was devoting most of his energies to preparing for the penalty phase.

Judge McKee declined to rule on the *Marsden* motion and transferred the matter to Judge George. After the transfer, Judge George asked defendant to state his complaints against his trial counsel. Defendant said that counsel was misleading him, and he referred Judge George to the letter the inmate had written on his behalf. After reading the letter, Judge George asked defendant if he wished to say anything else. Defendant answered, "No." Judge George then asked trial counsel whether in his opinion there was a conflict of interest that would justify relieving the public defender's office. Counsel answered in the negative. Judge George then denied the motion to relieve the public defender's office.

 We reject defendant's contention that Judge George abused his discretion in denying the motion to relieve appointed counsel. Defendant

argues that Judge George failed to make an adequate inquiry into defendant's reasons for requesting substitute counsel. The record shows, however, that Judge George asked defendant three times to state the grounds of his motion, never interrupted defendant's explanation, and read and considered the letter that defendant submitted. This was sufficient to satisfy the court's duty of inquiry. (See *People v. Hines* (1997) 15 Cal.4th 997, 1023-1024 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Applying the deferential abuse of discretion standard of review to the court's ruling denying the motion to relieve counsel (*People v. Earp* (1999) 20 Cal.4th 826, 876 [85 Cal.Rptr.2d 857, 978 P.2d 15]), we discern no such abuse here. Defendant's vague allegations that his attorney was misleading him or pressuring him to waive his speedy trial rights fall well short of establishing that counsel was not providing adequate representation or had become embroiled in such an irreconcilable conflict with defendant that ineffective representation was likely to result. (*Ibid.*)

## II. *Adequacy of Notice of Felony-murder Theory*

█ Defendant urges this court to reverse the two convictions for murder in the first degree on the ground that he received insufficient notice of the charged offenses. As to each count, the information charged defendant with "the crime of murder, in violation of Section 187, Penal Code, a felony committed as follows: That the said Mauricio Rodriguez Silva . . . did willfully, unlawfully, and with malice aforethought murder [victim's name], a human being." The information did not refer to felony murder, but the court instructed the jury on both felony murder and murder committed with premeditation and deliberation. Defendant contends the information did not give him notice that the prosecution would proceed on a felony-murder theory.

"[W]e have long held that a pleading charging murder adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory." (*People v. Gallego* (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169].) Defendant mistakenly relies on *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], and in particular on a statement in the plurality opinion that the "two kinds of murder," felony murder and murder with express or implied malice, "are not the 'same' crimes." (*Id.* at p. 476, fn. 23 (plur. opn. of Mosk, J.).) As we have since explained, however, this means only that the elements of the two kinds of murder differ; there is but a single statutory offense of murder. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394-395 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Pride* (1992) 3 Cal.4th 195, 249 [10 Cal.Rptr.2d 636, 833 P.2d 643].) "Felony murder and premeditated murder are not distinct crimes . . . ." (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

Because of the different varieties of murder, we have acknowledged that in some instances an information charging murder without elaboration may not provide notice sufficient to afford the due process of law guaranteed by the Fourteenth Amendment to the federal Constitution. (*People v. Gallego, supra,* 52 Cal.3d 115, 189; *People v. Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446].) Here, however, defendant could not have been taken unawares. The prosecutor's references in opening statement to defendant's intent to rob murder victim Hilton and to defendant's attempt to find Kitzler's money after killing her, followed by introduction of evidence showing attempted robbery of the victims, provided sufficient notice of the prosecution's felony-murder theory. (See *People v. Davis, supra,* 10 Cal.4th 463, 513.) In any event, because defendant did not move to reopen when he learned that the court would instruct the jury on felony murder, his claim of insufficient notice is not preserved for appellate review. (*People v. Memro* (1995) 11 Cal.4th 786, 869 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

III. *Sufficiency of Evidence of First Degree Murder of Monique Hilton*

■ Defendant contends the evidence presented at trial was insufficient to establish that the murder of Monique Hilton was murder of the first degree. We disagree.

The prosecution argued alternative theories of premeditated murder and felony murder, relying on the statutory provision that a murder is of the first degree if it is a "willful, deliberate, and premeditated killing," or a killing "committed in the perpetration of, or attempt to perpetrate . . . robbery . . . ." (§ 189.)

■ To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80].) We apply this standard in determining the sufficiency of the evidence to establish premeditation and deliberation as elements of first degree murder. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124-1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) Evidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative. (*Id.* at pp. 1125-1126.)

■ Defendant concedes that he killed Monique Hilton, and that he did so intentionally, but he maintains that he did not intend to rob her and that

the killing was an impulsive, unplanned act. He relies on statements he made during the tape-recorded interview with investigating officers. In that interview, he said he drove Monique Hilton out to the desert because he wanted to find out whether the body of Walter Sanders had been discovered. He then changed his mind and stopped the car intending to confront Monique Hilton. He did not want to take her money but he wanted to find out if she had been lying to him and taking advantage of him when she said she had no money and persuaded him to buy food and clothing for her. He thought she was still lying to him when she continued to deny that she had any money, and in a fit of anger he shot and killed her.

The jury was not required to accept this version of events. A rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving, particularly in light of defendant's expressed concern, both during the interview with the officers and in his telephone conversation with Anita Rinker, that he could receive the death penalty. A rational trier of fact could reject as implausible defendant's explanation that he drove Monique Hilton, a relative stranger and a person whom he admitted he did not trust, down a dirt road in a relatively isolated desert area to look for the body of someone he had recently killed. A rational trier of fact could infer instead that defendant selected this location because it was a place where no potential witnesses or rescuers could see them or hear Monique Hilton's cries for help and the sounds of a shotgun firing. In other words, a rational trier of fact could infer that defendant took Hilton to the place where she died because he had already formed the intent to rob or to kill her, or to both rob and kill her. Thus, the murder's isolated location, selected by defendant, is itself evidence of planning. Defendant's statements that he believed Hilton had lied to him about having no money and had taken advantage of him in persuading him to spend his money on her are evidence of motive. The manner of killing—multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant—is entirely consistent with a premeditated and deliberate murder. Thus, having reviewed the entire record in the light most favorable to the prosecution, we conclude that it contains ample evidence to sustain the verdict of first degree murder on a theory of premeditation and deliberation.

We conclude as well that the record contains ample evidence to sustain the verdict of first degree murder on a theory of a killing during an actual or attempted robbery. A rational trier of fact could reject as implausible defendant's assertion that although he suspected that Monique Hilton had lied when she said she had no money, and had taken advantage of him by persuading him to buy things for her, and although he demanded that Hilton show him her money, and reinforced the demand by brandishing his shotgun, and

although he had purchased the shotgun for use in committing robberies, he had no intent to take her money by force or intended to take only enough to reimburse himself for what he had spent for her food and clothing (see *People v. Sakarias* (2000) 22 Cal.4th 596, 622-623 [94 Cal.Rptr.2d 17, 995 P.2d 152]). A rational trier of fact could infer instead that defendant's intent was to take any money or other thing of value that Hilton might have, and that he killed her while attempting to carry out this intent.

IV. *Sufficiency of Evidence of First Degree Murder of Martha Kitzler*

■ Defendant contends his conviction for the first degree murder of Martha Kitzler must be reversed because this count was submitted to the jury on alternative theories of felony murder and premeditated murder, the evidence was legally insufficient to support the felony-murder theory, and there is a reasonable possibility the jury relied on the unsupported felony-murder theory.

This count was not submitted to the jury on alternative theories of premeditated murder and felony murder, but only on the theory of premeditation. Although some of the trial court's instructions to the jury on first degree murder applied to all three murder counts alike, the trial court gave a special instruction, applicable only to the count charging the murder of Monique Hilton, requiring jury unanimity as to the theory of first degree murder. (But see *People v. Pride, supra,* 3 Cal.4th 195, 249 [jury unanimity on first degree murder theory not required].) In argument to the jury, the prosecutor argued only the theory of premeditation and deliberation in urging a verdict of first degree murder in the slaying of Martha Kitzler. The prosecutor argued a theory of felony murder in the commission of robbery only as to the killing of Monique Hilton, and not as to the killing of Martha Kitzler. Viewing the jury instructions and the arguments of counsel together, a reasonable juror would have understood that the felony-murder theory applied only to the killing of Monique Hilton, and not to the killing of Martha Kitzler.

Assuming for argument's sake only that the killing of Martha Kitzler was submitted to the jury under alternative theories, and assuming also that the evidence was insufficient to support the felony-murder theory, we conclude that defendant was not prejudiced because it is not reasonably probable that the jury relied on a factually unsupported theory. If a count is submitted to a jury on alternative theories, and the evidence is insufficient as to one theory, we assume that the jury rested its verdict on the theory adequately supported by the evidence, particularly when that was the only theory mentioned by counsel during argument. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127-1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) The evidence here is more than

adequate to support the verdict of first degree murder in the killing of Martha Kitzler on the theory of premeditation and deliberation. In his tape-recorded statement, defendant admitted that he had already formed the intent to kill Kitzler when he went to his car to get his knife. Although he did not immediately proceed to carry out his plan, but instead put the knife down inside the house before Kitzler saw it, this only emphasizes that defendant had ample time to reflect before he strangled Kitzler.

### V. Failure to Instruct on Theft as Lesser Included Offense of Robbery

Although the charges against defendant did not include robbery, the trial court instructed the jury, under the felony-murder doctrine, that defendant could be convicted of the charged offense of murder if the jury found that the murder occurred during the course of a robbery, and the court accordingly instructed the jury on the elements of robbery. Defendant maintains that in this context the trial court on its own initiative should also have instructed on the elements of theft as a lesser included offense of robbery. Asserting that the jury could have found on the evidence presented that defendant formed the intent to steal only after he had killed a victim, defendant argues that a taking under those circumstances was theft and not murder.

Although a trial court on its own initiative must instruct the jury on lesser included offenses of *charged* offenses, this duty does not extend to *uncharged* offenses relevant only as predicate offenses under the felony-murder doctrine. (*People v. Miller* (1994) 28 Cal.App.4th 522, 526-527 [33 Cal.Rptr.2d 663]; see *People v. Memro, supra,* 11 Cal.4th 786, 888-890 (conc. & dis. opn. of Kennard, J.).) Because defendant was not charged with robbery, the trial court did not have to instruct the jury on theft as a lesser included offense of robbery.

Defendant may be understood to argue also that the trial court, again on its own initiative, should have given the jury a special instruction highlighting the issue of after-formed intent—that a defendant who forms the intent to steal only after killing or otherwise using force against the victim is not guilty of robbery. We reject this contention because an after-formed intent instruction is a pinpoint instruction that a trial court has no obligation to give when neither party has requested that it be given. (*People v. Webster* (1991) 54 Cal.3d 411, 443 [285 Cal.Rptr. 31, 814 P.2d 1273].) Moreover, we have held that the standard instructions on felony murder and robbery, CALJIC Nos. 8.21 and 9.10, "adequately cover the issue of the time of the formation of the intent to steal." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836]; accord, *People v. Hayes* (1990) 52 Cal.3d 577,

625-626 [276 Cal.Rptr. 874, 802 P.2d 376].) The trial court gave those standard instructions to the jury in this case. In particular, the felony-murder instruction stated that a killing was murder of the first degree if it occurred "as a result of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit such crime . . . ." "A reasonable juror would necessarily understand from this instruction that defendant was guilty of robbery-murder only if the intent to steal was formed before the fatal blow was struck." (*People v. Hayes, supra,* at p. 629.)

### VI. *Prosecutorial Misconduct in Referring to Manslaughter Conviction*

 The charges against defendant included an allegation that he had served a separate prison term for a 1978 voluntary manslaughter conviction. During jury voir dire, the trial court ruled that the prosecution could not use evidence of the facts underlying this earlier offense to prove the current murder charges. Consistent with this ruling, the prosecution introduced evidence of the 1978 conviction and state prison term, but not evidence of the circumstances of the offense. The court instructed the jury to determine the truth of the prior prison term allegation, but not to consider the prior conviction "as proof that the defendant committed the crimes charged in the information."

Defendant contends that the prosecution violated the court's ruling and committed misconduct throughout the guilt phase of the trial by repeatedly referring to the circumstances underlying the 1978 manslaughter conviction. He contends also that the trial court erred in denying two motions for mistrial based on this misconduct. We consider the specific instances of alleged misconduct in chronological sequence.

During jury voir dire, the prosecutor asked whether any member of the jury panel had any particular knowledge of the Pearblossom area of Los Angeles County, adding that "three of the crimes actually that have been committed or alleged to have been committed by the defendant, the one in '78 and two of the crimes now were alleged to have been committed in the area of Pearblossom." The defense moved for mistrial; the court denied the motion.

 A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Here, because no jury had been sworn and the trial had not

begun, it is doubtful that a mistrial motion, rather than a motion to quash or dismiss the venire, was procedurally correct. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 722, fn. 7 [60 Cal.Rptr.2d 1, 928 P.2d 485].) In any event, the trial court could reasonably conclude, in the exercise of its discretion, that the prosecutor's brief reference to the location of the 1978 killing did not irreparably damage defendant's chances of receiving a fair trial.

■ The claim of prosecutorial misconduct based on this remark is not reviewable. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) ■ Here, the defense, after raising a timely objection, expressly declined the court's offer to admonish the jury to disregard the prosecutor's remark. Because an admonition would have cured any harm, the failure to request an admonition renders the claim of misconduct unreviewable.

Were we to conclude that the misconduct claim was reviewable, we would also conclude that it is lacking in merit. Although it is misconduct to elicit or attempt to elicit inadmissible evidence in violation of a court ruling (*People v. Price, supra,* 1 Cal.4th 324, 451), the trial court had not yet ruled on the admissibility of the circumstances of the 1978 offense when the prosecutor first alluded to the location of that offense, and thus the remark violated no court ruling. ■ Conduct by a prosecutor that does not violate a court ruling is misconduct only if it amounts to "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury" (*People v. Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]; accord, *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204]) or "is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process" (*People v. Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619]). ■ The prosecutor's brief reference in voir dire to the location of the 1978 homicide was not egregious, deceptive, or reprehensible because, absent a ruling, the prosecutor could reasonably think that the facts of the 1978 offense might be admissible, a position he later argued to the trial court, though without success.

During the evidentiary portion of the guilt trial, the prosecutor on one occasion disregarded the trial court's ruling. In direct examination of an investigating officer, the prosecutor asked how far the scene of the 1978 homicide was from the locations where the bodies of Walter Sanders and Monique Hilton were found. The defense promptly objected, the trial court

sustained the objection, and the witness never answered the question. The trial court denied a defense motion for mistrial.

Although the defense objected to the prosecutor's question to the investigating officer, the defense declined to have the trial court admonish the jury to disregard the question. Because such an admonition would have cured any harm, the failure to request an admonition renders the prosecutorial misconduct claim unreviewable. In any event, although the prosecutor's question about the location of the 1978 homicide violated the court's earlier ruling that the circumstances of that offense were inadmissible, and so was improper, this improper question did not result in any prejudice to defendant or render the trial fundamentally unfair.

During argument to the jury at the guilt phase, the prosecutor several times referred to the 1978 voluntary manslaughter conviction, arguing that it supported the conclusion that defendant premeditated the three charged murders and that these offenses therefore were murders of the first rather than the second degree. The defense raised no objection, nor did it request any admonition. Nonetheless, defendant now asserts a claim of prosecutorial misconduct based on these remarks.

The absence of both an objection and a request for admonition makes defendant's claim unreviewable. Nonetheless, because defendant also claims that his trial attorney violated his constitutional right to the effective assistance of counsel by this failure to object, we consider whether the prosecutor's argument constituted misconduct.

During his argument to the jury, the prosecutor did not refer to the details or the circumstances of the 1978 voluntary manslaughter offense, and so the argument did not violate any court ruling. The facts to which the prosecutor did refer—defendant's 1978 voluntary manslaughter conviction, the prison term he served for that offense, and his release from prison shortly before the three charged murders—were all supported by evidence adduced during the trial. The argument was not deceptive, reprehensible, or egregious. The thrust of the argument was that defendant, having once killed another human being and having suffered conviction and imprisonment for that conduct, would know what killing another human being means and what its consequences are, and that this knowledge made it more likely that when defendant again killed he did so with premeditation and deliberately rather than rashly and impulsively.

In argument to the jury, prosecutors have wide latitude to suggest inferences that may be drawn from the evidence presented at trial, and whether

the inferences are reasonable is generally a matter for the jury to decide. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Although the logic of the prosecutor's argument—that a person's recent completion of a prison term for voluntary manslaughter would strongly motivate that person to pause and reflect before committing another homicide, thus supporting an inference of premeditation—may seem somewhat tenuous, we are unable to conclude that the argument itself constituted misconduct. In any event, the jury's verdict of second degree murder for the killing of Walter Sanders, the first of the three killings charged in this case, suggests that the jury did not find the inference urged by the prosecutor particularly compelling. Accordingly, defense counsel's failure to object does not demonstrate constitutionally deficient performance.

## ISSUES RELATING TO PENALTY

■■■■ Defendant raises several claims of error regarding the penalty phase and the validity of his death sentence, but we need consider only one. During jury selection, the defense alleged that the prosecutor had improperly used peremptory challenges against five Hispanic prospective jurors, and the trial court found a prima facie case of invidious discrimination, but the court erroneously permitted the prosecutor to give his reasons for the peremptory challenges in ex parte hearings, out of the presence of defendant and his attorney. Although the record of voir dire failed to support some of the reasons that the prosecutor gave, the trial court accepted every reason without inquiry and denied the defense motion, with the result that no Hispanic served on the jury that returned the death verdict. We will conclude that the denial of the defense motion was prejudicial error requiring reversal of the death sentence.

### VII. *Discrimination in Peremptory Challenges*

Early in the jury selection process for the penalty retrial, the prosecutor revealed an acute sensitivity to the presence of Hispanics on the jury panel and an evident belief that Hispanics would not be favorable jurors for the prosecution. The first penalty phase had resulted in a hung jury, with the final vote seven for a sentence of death and five for a sentence of life imprisonment without parole. Before the penalty retrial, the defense challenged the jury panels as not providing a fair cross-section of the community, and the prosecutor said this: "I also believe that [defense counsel] has only made a record on Hispanic surnames and has not included any other races, creeds, or colors such as black, oriental because *the first trial hung up on racial grounds*. [Defense counsel] is well aware that *four of the five people in the first trial were Mexican-Americans or at least had those surnames that*

*voted for life without possibility of parole.* And I believe that [defense counsel] is trying to influence this court, at this time, so that he gets the same type of a panel he got on the first trial." (Italics added.)

Some days later, the prosecutor again said he believed the hung jury in the first penalty trial "was based on race." Eventually the prosecutor explained: "When I was speaking to the jurors that voted for life without parole, four of those jurors were in fact Hispanic . . . [and] one of the Hispanic jurors turned to the only Hispanic juror who voted for death and said, 'You let us down,' meaning 'You are Hispanic. We are Hispanic. We are a group.' And 'You let us down because you didn't vote for life without parole.' That's what I based my comment on." Despite his stated belief that the hung jury during the first penalty trial was attributable to the racial or ethnic bias of Hispanic jurors, the prosecutor denied that he would exercise any peremptory challenge "on the basis of race, creed or color." But the implausible explanations that the prosecutor later gave for exercising peremptory challenges to exclude *every* Hispanic from the jury at the retrial of penalty raise grave doubts about the sincerity of this statement.

### A. The first Batson/Wheeler motion

During jury selection, the defense charged that the prosecutor had exercised peremptory challenges against three prospective jurors—Jose M., Jose C., and Armida S.—solely because of their Hispanic ancestry or surnames, in violation of the federal and state Constitutions. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [106 S.Ct. 1712, 1716-1719, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748].) Based on this charge, the defense moved to dismiss the panel and begin jury selection anew. Finding that the defense had stated a prima facie case, the trial court asked the prosecutor to explain the reasons for the challenges. The prosecutor requested an ex parte hearing, out of the presence of defendant and defense counsel, to state the reasons for the peremptories. Over defense objection, the trial court agreed.

### 1. Jose M.

During the ex parte hearing, the prosecutor said he challenged M. because, during the death qualification voir dire, M. said "he would look for other options" when the prosecutor "asked him could he exercise his discretion to impose the death penalty," and M. "indicated that he thought it was the toughest penalty, and he would look for other options." The prosecutor said he "also felt that [M.] was an extremely aggressive person and might hang the jury with his thoughts at that point . . . ."

Defendant alleges, and we agree, that the transcript of the death-qualification voir dire provides no support for either of these reasons. When defense counsel asked M. for his opinion on the death penalty, M. answered: "Well, I guess I have an opinion on it. I mean, it's the most—the hardest—oh, what's the word I'm looking for—punishment you can give." When defense counsel asked M. to clarify whether he was for or against the death penalty, he replied: "I would say I'm mixed. I would, you know, consider it and I would consider opposition to it." Defense counsel then explained how a jury is supposed to decide the penalty in a capital case, and M. said he could do that. Defense counsel asked: "So you're saying you don't think you would have a problem returning either verdict?" M. replied: "No."

In answer to further questioning by defense counsel, M. promised that he would engage in deliberations, that "after doing that process" he would "definitely" stand by his decision if he was convinced he was right and the others were wrong, but also that he would reanalyze his own decision if other jurors convinced him he was wrong.

In reply to the prosecutor's questions, M. said he did not consider himself an "overly sympathetic person," and he assured the prosecutor that he would "listen to all the evidence that's presented" from "both sides," that he would attempt to arrive at a fair and impartial verdict "whatever it is," that if the jury was "hung up one way or the other" he would "back off" and "listen to the other jurors and ask [him]self 'Was I right or was I wrong?' " In response to the prosecutor's question asking whether he was "a strong enough person" if he felt he was wrong "to admit this out loud and change [his] vote," M. answered "Certainly."

The prosecutor then asked: "Do you lean one way or the other on the death penalty, do you think?"

M. answered: "Possibly slightly for it."

Finally, the prosecutor asked M. whether he could return a death verdict against defendant "if he's earned the death penalty." M. answered "Yes."

### 2. *Jose C.*

During the ex parte hearing, the prosecutor said he challenged C. because, during the death qualification voir dire, C. "indicated that he leaned away, or I thought he leaned away, from the death penalty from all that was said." The prosecutor added: "Also, if the court will recall, Mr. [C.] had indicated during [defense counsel's] questioning that he had had several fist fights out

in the street. I don't know if the court recalls that or not, but he was talking about he and his brother being jumped and beaten up." The court said it did recall C. saying that. The prosecutor continued: "I was very worried about a person that was out there. Maybe it wasn't his fault. I got the feeling that trouble rather followed Mr. [C.] I felt uneasy with Mr. [C.] being that he had been in so many fist fights, at least three that I think he had recalled, one was gang-related. It seems to me he might have been in an area where it was gang activity, I had an idea because of the fist fights and because he had been beaten up and so on. Also because there was great violence in this case, and fist fights in the cell, I asked Mr. [C.] be excused on that basis."

Defendant alleges that the record of the death-qualification voir dire provides no support for the prosecutor's statement that C. "leaned away" from the death penalty. When defense counsel asked whether he had thought about the death penalty, C. answered: "I had given it some thought but I never come to a conclusion. I never had to form a strong opinion about it." C. agreed that he was "not really strong pro death penalty, . . . not strong anti-death penalty."

During questioning by the prosecutor, C. said he had "some friends that have very strong opinions for the death penalty." C. had discussions with his friends about this at work, but he usually did not take a position on the death penalty. C. explained: "I'm kind of familiar with both sides, but I haven't taken a stand. Although there's been times when I have felt that the—there was a place for the death penalty." Asked by the prosecutor whether he "lean[ed] away from it in most cases," C. answered: "That's just the thing, you know, I've gone back and forth, because I think there's no mitigating circumstances, and sometimes I just think that, you know, there's just no other way to render justice." The prosecutor asked: "The death penalty in some cases, in your mind, is appropriate and in other cases, life without parole is appropriate, is that right?" C. answered, "Yes."

The prosecutor then explained the process of penalty determination in a capital case, asking C. at various points whether he understood. The prosecutor then asked C. if he was a "strong enough person" to return a death verdict and affirm it in court in the presence of the defendant. C. replied, "I think so." The prosecutor then said: "You're really hesitating and it kind of worries me and I just want to know what's going on inside right now, because you're kind of smiling and because I know you're fishing in your mind for the right—the right way to answer it truthfully. And I know that you're trying to be truthful." C. answered: "I never thought that I'd get called into a case like this to begin with, being my first time . . . and whatnot. So, I said it's not an easy decision to make and because it's such a

decision to make, I can't just blurt out an answer." Finally, the prosecutor asked whether C. leaned one way or the other on the death penalty. C. answered: "I think if I lean, it's toward the death penalty."

During the general voir dire, in response to questions by defense counsel, C. described two incidents (not three, as the prosecutor later stated) in which he was involved in fights. He said the first incident happened "a while back" when he "was probably around 15 or 16 or 17 years old, and there was three guys in another car, and some words were passed, what have you, and there was a chase ensued after that and [his] car stalled" and he fought because "two guys jumped on" him. The second incident happened "somewhere else, at a later date." He was "walking down the street" with his cousin when they "bumped into two guys and they started a fight." His cousin "hit one of them and then, out of the bushes came out about ten other guys." C. said the incidents would not affect his ability to be fair.

The prosecutor did not question C. about these incidents or how they would affect his performance as a juror. Indeed, the prosecutor declined to question C. at all during general voir dire.

### 3. Armida S.

During the ex parte hearing, the prosecutor said he challenged S. because she "worked for the Department of Social Services . . . at least at one point" and because she had argued with the prosecutor during the death-qualification voir dire. The prosecutor added: "I asked her the same questions I was asking the other jurors about, 'Could you do it? Would you do it?' And Miss [S.] backed up and started arguing with me about that. I think if you look the record up, the court will recall she and I just did not get along. We had, in fact, during [death-qualification voir dire] an argument about whether she was going to do it. She was very argumentative towards me. She was not towards [defense counsel]. That's why I excused Miss [S.]"

The record does not support the prosecutor's assertion that S. had worked for the Department of Social Services, although she stated on her questionnaire that one of her children did. The matter was not raised during general voir dire, at which the prosecutor declined to question S. at all.

Defendant alleges that the transcript of the death-qualification voir dire fails to support the prosecutor's assertion that S. had argued with him. This is what the transcript shows:

The prosecutor: "[Defense counsel] was asking you about whether you would stick by your guns so to speak back there in the jury room. You

understand that both [defense counsel] and myself want a decision in this matter. We're not asking you to change your mind just so that we can have a decision, but that in fact if you go back there and it's 10 to 2, 11 to 1, and you're the one, whichever way you're leaning, will you listen to the other jurors?"

S.: "Yes, I would to a certain extent."

The prosecutor: "Only to a certain extent?"

S.: "Well, yes."

The prosecutor: "Are you too proud to change your mind even if they—"

S.: "No."

The prosecutor: "—Even if they show you you're wrong?"

S.: "If they show me I'm wrong, I'm going to change my mind, yes."

The prosecutor: "That involves listening, that involves listening to the other jurors."

S.: "Yes."

The prosecutor: "Will you do that?"

S.: "Yes."

The prosecutor: "We want a decision. And I'm not saying you're going to be hung up one way or the other. I'm just saying that let's say you go back there. Very often jurors go back into the jury room and not everybody sits down and says we think it should be this way or we think it should be that way. They're hung up at the beginning. They're decided, not hung up but decided. What we don't want you to do is get your ego involved so that you can't say, 'You're right. Maybe I should change my mind.' We don't want that. We want a juror that will go back there and that will listen to both sides even though she may have made up her mind. She'll listen to both sides and then she'll, after having heard both sides, change her mind if she thinks it's warranted. Are you that type of juror?"

S.: "I believe I am."

The prosecutor: "Are you a fair-minded person?"

S.: "Yes, I am."

The prosecutor: "Incidentally, do you think you're an overly sympathetic person?"

S.: "No."

The prosecutor: "The defense may try and prove to you that the death penalty is not warranted just on your sympathies alone and that's perfectly legal. You're allowed to do that. Do you think you're an overly sympathetic person that wouldn't give me a chance, and that would only consider sympathy and nothing else?"

S.: "No."

The prosecutor: "Tell me something else. While you're considering whatever sympathy this defendant may put on before you, can you keep an open mind that you can also feel sympathy for four dead human beings if you find they died at the hands of the defendant in this matter? Will you keep this in mind also?"

S.: "Yes."

The prosecutor: "And will you put that on the scale if you think it should be there?"

S.: "Yes."

The prosecutor: "Ma'am, are you a strong enough person—I intend to prove that death is the appropriate penalty, in this case. And if and only if I do that, are you a strong enough person to come back into this courtroom, sit down in that jury box, and look us all in the eye and pronounce that judgment. Can you do it?"

S.: "I think so. It's—"

The prosecutor: "And will you do it if it is the right thing to do?"

S.: "Yes. I would."

### 4. *The trial court's findings*

During the brief ex parte hearing, in which the prosecutor gave his reasons for exercising peremptory challenges against Prospective Jurors M., C., and

S., the trial court did not ask the prosecutor any questions and did not remark on any discrepancies between the prosecutor's stated reasons and the prospective jurors' responses on voir dire or on their questionnaires. When proceedings resumed in the presence of defendant and defense counsel, the trial court denied the first *Batson/Wheeler* motion. The court said only that the prosecutor "did provide an explanation with regard to" the three peremptory challenges and that "I think that there was a good excuse with regard to all of these people."

## B. *The second Batson/Wheeler motion*

Later during voir dire, after the prosecution had exercised additional peremptory challenges, the defense renewed the *Batson/Wheeler* motion, charging that the prosecutor had exercised peremptory challenges against two more prospective jurors—Rosalinda R. and Ernestina R.—solely because of their Hispanic ancestry or surnames. Over defense objection, the trial court again held an ex parte hearing at which the prosecutor gave reasons for the challenges.

### 1. *Rosalinda R.*

During the ex parte hearing, the prosecutor said he challenged Rosalinda R. because she "had worked for L.A.P.D. for ten years," and the prosecutor did not "know what effect that would have on her," and because she "made a point of indicating to us her brother had been beaten by officers who had belonged to L.A.P.D.," as a result of which the prosecutor "felt uneasy with" her.

On the jury questionnaire, in answer to whether she or any friend or family member had been a crime victim, Rosalinda R. wrote: "My brother was beaten by police officers." On general voir dire, she said she had worked as a clerk typist for "L.A.P.D." (the Los Angeles Police Department) for 10 years, and as a result knew many police officers. She said this would have no effect, however, and she "definitely" could judge the testimony of a police officer the same as any other witness. She had not worked in the Hollywood division and did not recognize the names of any of the officers who would testify. She had worked in the records department. Regarding the incident with her brother, she said it had happened two years earlier, when she was no longer working for the police department, and the officers involved were sheriff's deputies, not police. She had no hard feelings about it, and she "never got into it" because she and her brother were not "that close." She had enjoyed working for the police.

### 2. *Ernestina R.*

During the ex parte hearing, to explain his challenge of Ernestina R., the prosecutor said: "Miss [R.] indicated she had a husband that was shot to

death, which leads me to believe what effect that would have on the robbery [*sic*]." He said he had "mixed emotions" because "[s]he seemed to be sympathetic to the defense, but at the same time she had a close cousin that had been shot to death in a robbery," and the prosecutor "didn't know how to reconcile with those two."

On her juror questionnaire, in answer to whether she or any friend or family member had been a crime victim, Ernestina R. wrote: "My nephew was shot when he was trying to help some people that had been robbed." During general voir dire, she explained that the incident had occurred about two and one-half years earlier in East Los Angeles, where her nephew was living. The nephew was 28 years old, married, with young children. Some men committed a robbery in an apartment building, and her nephew saw them and chased them. They shot him, and he died on the spot. Ernestina R. did not know whether the culprits were apprehended, because she did not often see or visit the nephew's family. No one else close to her had ever been a victim of a violent crime.

Thus, the person who had been shot was not, as the prosecutor had said, Ernestina R.'s husband or "close cousin," but instead a nephew with whom she said she had not been particularly close. The prosecutor never explained how this experience would make her an unfavorable juror for the prosecutor, nor did the prosecutor explain the conclusory assertion that she "seemed to be sympathetic to the defense." Respondent has not called our attention to anything in the record of voir dire that supports that assertion.

### 3. *The trial court's findings*

The transcript of the second ex parte hearing comprises a single page. As in the first ex parte hearing, the trial court did not question the prosecutor or remark on the apparent disparity between the prosecutor's stated reasons and what the record shows to have occurred during voir dire. When proceedings resumed in the presence of defendant and defense counsel, the court said only this: "I did hear the explanations presented by the prosecutor with regard to peremptory challenges exercised against Rosalinda [R.] and Ernestina [R.], and they appear to be very valid reasons for those excuses." As a result of the prosecutor's peremptory challenges and the trial court's rulings, no Hispanic served on the jury that returned the verdict selecting the penalty of death.

### C. *The new trial motion*

After the jury had returned the death verdict, the trial court unsealed the transcripts of the ex parte hearings in which the prosecutor had stated his

reasons for the peremptory challenges of the five Hispanic prospective jurors. Defendant then moved for a new trial on the ground, among others, that the prosecutor had failed to give valid and sufficient reasons for exercising these peremptory challenges. Defense counsel argued to the court that almost all of the prosecutor's reasons were either unsupported by the record or inherently implausible. When denying the new trial motion, the trial court's only explanation was this: "Well, the Court held an in camera hearing with regard to the exclusion of several jurors, and the Court felt that there was sufficient reason for the exclusion of those witnesses—I mean for those jurors. So your motion is denied for a new penalty phase trial."

D. *Analysis*

■ The United States Supreme Court has given this explanation of the process required when a party claims that an opponent has. improperly discriminated in the exercise of peremptory challenges: "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834].)

■ Here, in step one, the trial court ruled for the defense when it found a prima facie case of improper discrimination, and we assume that substantial evidence supports that determination. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 197 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In step two, the prosecutor defended the five challenged strikes by giving reasons that were facially neutral as to Hispanic ancestry or surname. (See *Purkett v. Elem, supra,* 514 U.S. 765, 768 [115 S.Ct. 1769, 1771] [" 'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' "].) Our concern here is with step three: whether the record as a whole shows purposeful discrimination.

Before addressing that question, however, we note that the trial court erred in excluding the defense from the hearing at which the prosecutor stated his reasons. (See *People v. Ayala* (2000) 24 Cal.4th 243, 262 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *U.S. v. Thompson* (9th Cir. 1987) 827 F.2d 1254, 1257.) The trial court partially alleviated the effect of this error, however, by giving the defense an opportunity to comment on the prosecutor's reasons when it unsealed the transcripts of the ex parte hearings after the jury had returned the penalty verdict. The defense availed itself of this opportunity by arguing,

as a ground for new trial as to penalty, that the prosecution's stated reasons were unsupported by the record and pretextual.

During the ex parte hearings, when the prosecutor gave reasons that misrepresented the record of voir dire, the trial court erred in failing to point out inconsistencies and to ask probing questions. "The trial court has a duty to determine the credibility of the prosecutor's proffered explanations" (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1220), and it should be suspicious when presented with reasons that are unsupported or otherwise implausible (see *Purkett v. Elem, supra,* 514 U.S. 765, 768 [115 S.Ct. 1769, 1771] [stating that at step three "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"]; *McClain v. Prunty, supra,* at p. 1221 ["Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised."]).

In particular, we agree with defendant that the court erred in denying the motion as to Prospective Juror Jose M. Nothing in the transcript of voir dire supports the prosecutor's assertions that M. would be reluctant to return a death verdict or that he was "an extremely aggressive person." Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent (*People v. Williams* (1997) 16 Cal.4th 153, 189 [66 Cal.Rptr.2d 123, 940 P.2d 710]), it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue (*McClain v. Prunty, supra,* 217 F.3d 1209, 1220-1224; *Johnson v. Vasquez* (9th Cir. 1993) 3 F.3d 1327, 1331). We find nothing in the trial court's remarks indicating it was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against M. and the facts as disclosed by the transcripts of M.'s voir dire responses. On this record, we are unable to conclude that the trial court met its obligations to make "a sincere and reasoned attempt to evaluate the prosecutor's explanation" (*People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]) and to clearly express its findings (*People v. Fuentes* (1991) 54 Cal.3d 707, 716, fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75]).

We conclude that the trial court's ultimate determination—that defendant failed to meet his burden of proving intentional discrimination with respect to the prosecutor's peremptory challenge of Prospective Juror M.—is unreasonable in light of the evidence of the voir dire proceedings. Although we generally "accord great deference to the trial court's ruling that a particular

reason is genuine," we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. (*People v. Fuentes, supra,* 54 Cal.3d 707, 720; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1197-1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient. As to Prospective Juror M., both of the prosecutor's stated reasons were factually unsupported by the record. Because the trial court's ultimate finding is unsupported—at least as to Prospective Juror M.—we conclude that defendant was denied the right to a fair penalty trial in violation of the equal protection clause of the federal Constitution (*Batson v. Kentucky, supra,* 476 U.S. 79, 84-89 [106 S.Ct. 1712, 1716-1719]) and was denied his right under the state Constitution to a trial by a jury drawn from a representative cross-section of the community (*People v. Wheeler, supra,* 22 Cal.3d 258, 276-277).

Our conclusion makes it unnecessary to determine whether the trial court erred in denying the *Batson/Wheeler* motion as to the other four Hispanic prospective jurors whom the prosecutor removed by peremptory challenge. The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal. (*People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Fuentes, supra,* 54 Cal.3d 707, 716, fn. 4; see *People v. Howard* (1992) 1 Cal.4th 1132, 1158 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

## DISPOSITION

The judgment is affirmed as to the guilt verdicts and the special circumstance finding, but it is reversed as to the sentence of death.

Mosk, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Harris, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.