Filed 10/5/16  P. v. Suarez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHNNY JOE SUAREZ,<br><br>    Defendant and Appellant. | H041111<br>(Santa Cruz County<br>Super. Ct. No. F24205) |

After a drive-by incident involving a gun, defendant Johnny Joe Suarez was charged with several firearm-related offenses, a gang allegation in connection with the firearm charges, and possession of methamphetamine found at the time of his arrest.

A jury convicted Suarez as follows:  felony assault with a firearm (Pen. Code, § 245, subd. (a)(2);[1] count 1), with an enhancement for personal use of a firearm in the assault (§ 12022.5); misdemeanor brandishing a firearm (§ 417, subd. (a)(2); count 2); being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 4); and felony possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 5).  The jury could not reach a verdict as to negligent discharge of a firearm (§ 246.3, subd. (a); count 3) or the gang allegations (§ 186.22, subds. (b)(1) & (d)).  The unresolved count and gang allegations were later dismissed.

The trial court sentenced Suarez to a total prison term of seven years eight months, comprised of three years on count 1, an additional four years for the personal use of a

---

[1] Unspecified statutory references are to the Penal Code.

firearm enhancement, a concurrent term of two years on count 4, and a consecutive term of eight months on count 5.[2] The trial court suspended execution of the sentence and placed Suarez on three years of formal probation, including consecutive one-year county jail terms on counts 1, 4, and 5. The trial court awarded 32 days of presentence credit and imposed fines and fees.

On appeal, Suarez contends that: (1) the prosecutor's use of a peremptory challenge to excuse a prospective juror of Hispanic/Latino ethnicity violated Suarez's constitutional rights to a fair trial and equal protection under the law; (2) the concurrent sentence on count 4, imposed as a consecutive year in custody as a condition of probation, should have been stayed pursuant to section 654 because it arose from the same course of conduct as the other firearm-related counts; (3) the trial court failed to specify the statutory bases for the fines imposed; and (4) the trial court failed to award presentence conduct credit.

## I. FACTS

Brothers Brian and Gustavo Alba were standing on the sidewalk in front of their house on September 5, 2012, waiting to take their mother to work. Their housemate, who was out walking his dog, approached and warned them that Suarez "just drove by."

Brian[3] and his housemate knew Suarez because the men had worked at a warehouse together earlier that year. Brian left the job at the warehouse because of bullying and harassment by certain coworkers who were associated with the Norteño gang. While Brian worked at the warehouse, Suarez participated in the bullying; he would "bark" like a dog and "mean-mug" or glare at Brian. Brian was not a gang

---

[2] The trial court later reduced the drug conviction to a misdemeanor pursuant to Proposition 47 (§ 1170.18) and struck eight months on count 5 from the suspended prison sentence.

[3] We use the brothers' first names to avoid confusion and not out of disrespect.

member but knew members of both the Norteño and Sureño gangs. He grew up with "[m]ostly Sureños" and sometimes was perceived to be Sureño.

As the brothers stood on the sidewalk, Suarez drove slowly past in a black SUV. Through an open passenger side window, Suarez pointed a gun at Brian and yelled, "fuck you, scrap,[4] Northside." The brothers ran and ducked behind the neighbor's truck. Suarez turned into a cul-de-sac down the street and fired one shot, though it is not known in what direction the shot was fired. Several witnesses heard the sound of a gunshot. Suarez turned back onto the street of the Alba's house, honked, and sped to the freeway.

Police arrested Suarez at work several days after the incident. The deputy who arrested Suarez transported him to the jail, where he left him in the backseat of the patrol car for about five minutes. When the deputy returned to retrieve Suarez, he immediately noticed a small plastic bindle containing a white crystalline substance, which he recognized as methamphetamine, which was also scattered across the floorboard carpet. Testing confirmed the substance was a useable amount of methamphetamine.

A search of Suarez's cell phone uncovered evidence of gang affiliation, including photographs, text messages, and YouTube searches related to guns, using search terms like "Stay strapped" and "[s]hoot out." Trial testimony for the prosecution indicated the phrase "stay strapped" is a reference to being armed, both in order to carry out crimes and for self-defense. Suarez admitted to police in 2008 that he was a member of a Watsonville gang affiliated with the Norteños.

## II. *BATSON/WHEELER*

During jury selection, the People used a peremptory challenge to excuse a prospective juror, P.L., who had a Spanish surname and appeared to be Hispanic or Latino. Suarez objected, arguing that under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by

---

[4] "Scrap" is a derogatory term used by Norteños for rival Sureños.

3

*Johnson v. California* (2005) 545 U.S. 162 (*Johnson*), the prosecutor had intentionally excluded P.L. on the basis of a group bias. The trial court denied the *Batson/Wheeler* motion, finding Suarez had not made a prima facie case of impermissible discrimination and crediting the prosecutor's explanation for exercising the peremptory challenge.

On appeal, Suarez argues that the removal of P.L. violated equal protection and his right to a jury drawn from a representative cross-section of the community. He also contends that the trial court failed to conduct an adequate review of his *Batson/Wheeler* motion. The parties dispute whether the trial court's ruling commands review at the first stage or third stage of the *Batson* sequence.

## A.    RELEVANT PROCEEDINGS

P.L. identified himself during voir dire as a glazer working at a glass company. His wife was a youth counselor for the county's probation department. He had lived in Santa Cruz County for 22 years. Defense counsel questioned P.L. about the presumption of innocence and her client's right to remain silent. P.L. responded that he understood the concepts and would not hold it against the defendant if he chose not to testify. P.L. responded affirmatively to statements that the defendant "doesn't have to prove his innocence to you," and that if picked to be on the jury, he would have to follow the law and set aside his natural inclination to want to hear from the accused.

The prosecutor examined the venire panel but did not ask P.L. any questions. The prosecutor excused P.L. with his second peremptory challenge. Defense counsel immediately brought a *Batson/Wheeler* motion that was heard outside the presence of the jury. Defense counsel believed the prosecutor had excused P.L. "based on his . . . race rather than any specific bias." She noted that during voir dire, P.L. said that he understood the presumption of innocence and the defendant's right not to testify and would follow the law and the court's instructions. She pointed out that the prosecutor "asked [P.L.] no questions during his time with the jury" and argued that based on the

4

answers of other jurors, she did not see "any specific bias" and did not think a comparison with jurors remaining on the panel would reveal "anything specific about [P.L.] other than his race for the basis of his peremptory challenge."

The prosecutor responded that the defense had not met its burden to show a prima facie case. He emphasized that he had "never, ever heard of such a motion being brought after the second peremptory challenge," but continued that "just to make sure the record is clean, I will state my reasons. [¶] When [P.L.] was walking out of the court for one of our breaks, he looked at me and had a very negative smirk on his face. I immediately didn't like the way he was looking at me. I sensed hostility. [¶] I ran him out in our computer system, and it turns out that someone with the same last, first, and middle names was in juvenile court, had a sustained petition for a 245 assault with also witness intimidation charges attached. Again, I don't know if it's the same person, but it's the same first, middle, last names. The date of birth was 1990, so I assume that's essentially the same correct age as [P.L.]. [¶] And based on his criminal past, I excused him. Also, I had—he did state that his wife was a youth counselor with probation. I know that they tend to be on the protective side when it comes to a lot of the youth who are involved in criminal street gangs. [¶] I considered that also as a possible negative count against the prosecution, not that I'm required at this point to justify what I did, but those are my reasons."

The trial court noted that P.L. has "a Latino or Hispanic surname and appears to be Latino or Hispanic or have that ethnicity." The court asked defense counsel to "help" it with the idea of a prima facie case.

Defense counsel asserted that P.L. not only had "a Hispanic surname, he's the only Hispanic on the panel, and he does have a Hispanic last name. He also has an appearance—he has a short buzzed haircut—which is consistent with someone who could probably be affiliated with a gang." Defense counsel questioned the alleged smirk as a basis for running P.L.'s criminal background and again emphasized that the prosecutor

5

asked no questions to address his stated concerns about P.L. She concluded that the prosecutor "automatically . . . labeled him as this person and now is excluding him on nothing else than the fact that he is a member of this group—this racial group, and that's impermissible."

The prosecutor responded there were two other jurors who "appear[ed] to be of Hispanic descent," Juror No. 5 and prospective juror C.G. who had a Hispanic surname though she appeared to be Caucasian. He urged that his stated reasons were "very fair" and "easily verifiable" and argued that defense counsel's accusation of "blatant racial profiling" was "very serious" and if repeated he would ask for a misconduct hearing. Defense counsel retorted that "during the break, [the prosecutor] did mention to me that [P.L.] was quote/unquote an 'esé.' So I want to make that on the record since we're throwing accusations back and forth." The trial court clarified that "esé" was a derogatory term. The prosecutor replied, "Your Honor, we are going to need to have that hearing now. I never said those words. Never in my life have I referred to someone as an esé."

The trial court called a recess, after which defense counsel clarified that she did not "want to make a personal attack on" the prosecutor. She explained that she was making a record for her client and was not going to say anything more about the prosecutor's actions: "I'm going to back up a little bit—I did get a little heated—and just allow the Court to make its decision with no further argument."

The trial court noted it should have asked the prosecutor first to respond only to the prima facie issue. Although the prosecutor stated his reasons for exercising the peremptory challenge, "I'm still required to consider . . . from the totality of the circumstances, . . . whether [defense counsel] has established an inference that [P.L.] was challenged because of group—group association." The trial court restated its finding that "[P.L] is a member of a cognizable group . . . . Hispanic or Latino . . . which is also the apparent ethnic background of Mr. Suarez." The court found that P.L.'s ethnicity was the

6

same as that of the victims, but was unable to draw a conclusion about other factors relevant to a prima facie case, such as "the pattern or timing of the challenges" or the proportion of group members challenged, since it was only the second peremptory challenge. On the other hand, the court noted that "the lack of any meaningful or any questions asked by" the prosecutor of P.L. weighed in favor of a prima facie finding. The court concluded, "I don't find there's sufficient information here just on the issue of prima facie case to find that there is a prim[a] facie showing of discriminatory use of challenges. I'm not going to go to the next step. [¶] . . . I'm going to deny the motion at this point."

After the trial court raised the issue of fairness with regard to the prosecutor's ability to run criminal records, however, the prosecutor added "that the only reason that I ran [P.L.] is because of the way he was glaring at me," stating it was "extremely uncomfortable." The trial court reiterated, "I'm not finding that there's been a prim[a] fascie [*sic*] showing. . . . I am crediting, however, [the prosecutor's] explanation that he gave him a look that he didn't like, . . . [¶] And that is a—can be an appropriate basis for the exercise of a challenge, so I will make that finding. I credit that that happened, and I find legally that that's an acceptable basis for using a challenge."

The prosecutor volunteered that he did not ask P.L. any questions because of the confidentiality rules for juvenile cases.[5] The court acknowledged the prosecutor's concern but noted the issue "wasn't whether you asked him questions about that. The issue was whether you asked him any questions at all about his views on things, and that's the more concerning part."

---

[5] Welfare and Institutions Code section 827 (setting forth limits on access to and inspection of juvenile case files).

**B.    APPLICABLE LEGAL PRINCIPLES**

A criminal defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." (*Batson*, *supra*, 476 U.S. at pp. 85-86.) The use of a peremptory challenge to exclude jurors on the basis of group bias infringes a defendant's constitutional right to a jury drawn from a representative cross-section of the community (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277) and to equal protection of the law (*Batson*, *supra*, at p. 86). For this reason, "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

"The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*), citing *Johnson*, *supra*, 545 U.S. at p. 168.) "As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.' " (*Batson*, *supra*, 476 U.S. at p. 93.)

At step one, sometimes referred to as the first stage of the *Batson* inquiry, the defendant produces "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson*, *supra*, 545 U.S. at p. 170.) At step two, the prosecutor "come[s] forward with a neutral explanation . . . ." (*Batson*, *supra*, 476 U.S. at p. 97.) At step three, or the third stage, the trial court evaluates "the persuasiveness of the prosecutor's justification for [the] peremptory strike." (*Miller-El v. Cockrell* (2003)

8

537 U.S. 322, 338-339 (*Miller-El*).) " 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) The trial court often bases its decision at the third stage on whether it finds the prosecutor's explanation to be credible. " ' "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 917 (*Jones*), quoting *Lenix*, *supra*, at p. 613; *Miller-El*, *supra*, at p. 339.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*Lenix*, *supra*, 44 Cal.4th at p. 613.)

## C. THE TRIAL COURT'S "HYBRID" FINDING CALLS FOR THIRD-STAGE REVIEW

Suarez contends that review at the third stage of the *Batson* inquiry is proper because the prosecutor volunteered his reasons for exercising the peremptory challenge before the trial court ruled on the prima facie case. He argues that under *Hernandez v. New York* (1991) 500 U.S. 352 (*Hernandez*), the prima facie issue is moot because the trial court was given a basis to rule on the ultimate issue of whether the prosecutor's use of the peremptory challenge was discriminatory.

*Hernandez* involved proceedings in which "[t]he prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination." (*Hernandez*, *supra*, 500 U.S. at p. 359.) Drawing from principles in title VII employment discrimination litigation, the Supreme Court explained: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie

9

showing becomes moot." (*Ibid.*) Given this sequence, the court concluded that the "standard inquiry into the objecting party's prima facie case was unnecessary" and affirmed the appellate court's third-stage review of the prosecutor's nondiscriminatory justification for exercising the peremptory challenges. (*Id.* at p. 372.)

The People respond that first-stage review is proper because here, unlike in *Hernandez*, there was no *implied* prima facie finding and the issue is not moot. Rather, after the prosecutor stated his reasons, the trial judge *expressly* found that Suarez had not established a prima facie case.

The People cite *People v. Davenport* (1995) 11 Cal.4th 1171 (*Davenport*), disapproved on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, footnote 5, in support of this argument. In *Davenport*, the prosecutor responded to a *Batson/Wheeler* objection by immediately stating his reasons for the peremptory challenges. The trial court indicated the prosecutor was " 'jumping way ahead' " (*Davenport*, *supra*, at p. 1198) because the court was " 'not convinced' " of a prima facie case. (*Id.* at p. 1199.) On appeal, our high court rejected the argument that the prima facie issue was moot and likened the sequence to one in which the trial court finds there is no prima facie case, but for purposes of completing the record asks the prosecutor to justify the peremptory challenges. (*Id.* at p. 1200.) *Davenport* stands for the proposition that "[a] trial judge who asks a prosecutor to respond to a *Wheeler* motion is not required to forcibly interrupt the prosecutor when the response concerns not whether a prima facie case was made, but the prosecutor's reasons for exercising his peremptory challenges, in order to retain his or her discretion to determine whether a prima facie case was established." (*Id.* at pp. 1200-1201.)

The People also rely on *Scott*, *supra*, 61 Cal.4th 363, a recent California Supreme Court decision clarifying the review procedure "when the trial court, having determined that no prima facie case was established and having heard the proffered justifications, goes ahead and makes an alternative holding that those reasons were genuine." (*Id.* at

10

p. 386.) *Scott* concluded that in those circumstances, "the appellate court should begin its review with the first-stage ruling" (*id*. at p. 389) and "[i]f the appellate court agrees with the trial court's first-stage ruling, the claim is resolved." (*Id*. at p. 391.) In arriving at this conclusion, the majority in *Scott* interpreted *Hernandez* to apply only when there is an implied prima facie finding, not an actual or express prima facie finding. (*Id*. at p. 393 (maj. opn.); but see *id*. at pp. 409-414 (dis. opn. of Liu, J. [disagreeing with majority's analysis of *Hernandez* and finding third-stage review is proper when prosecutor states reasons and trial court issues a ruling].)

We begin our analysis by noting that California authority on this issue, in the words of *Scott*, is "not . . . entirely consistent." (*Scott*, *supra*, 61 Cal.4th at p. 386.) On one hand, the predicate in *Scott* was an express ruling by the trial court on both the prima facie and ultimate issues of discrimination. The same being true here, one could argue that under *Scott*, Suarez's reliance on *Hernandez* is misplaced and first-stage review of the trial court's express prima facie finding is proper.

Yet *Scott*'s rule of first-stage review describes a factual and procedural sequence not present in this case: "where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson*/*Wheeler* motion with a review of the first-stage ruling." (*Scott*, *supra*, 61 Cal.4th at p. 391.)

Furthermore in a footnote, *Scott* "distinguish[ed] at the outset" (*Scott*, *supra*, 61 Cal.4th at p. 387, fn. 1) two cases that appear to align more closely to the sequence present here. Though not referenced by the parties to this appeal, those two cases, *People v. Chism* (2014) 58 Cal.4th 1266 (*Chism*) and *People v. Mills* (2010) 48 Cal.4th 158 (*Mills*), apply the reasoning in *Hernandez* and proceed with a third-stage review of what

11

they term a trial court's "hybrid" denial of a *Batson/Wheeler* motion. In contrast with *Davenport*, *supra*, 11 Cal.4th 1171, in which the trial court only ruled on the prima facie issue and never reached *Batson*'s third step, the trial courts in *Chism* and *Mills* passed judgment at the first and third steps of the *Batson* inquiry, though not in the orderly manner described in *Scott*. The instant case shares this feature with *Chism* and *Mills*.

In *Mills*, the defendant moved to quash the jury venire after the prosecutor exercised peremptory challenges to excuse six African-American prospective jurors. (*Mills*, *supra*, 48 Cal.4th at p. 173.) "After inviting the prosecutor to volunteer his reasons for exercising peremptory challenges against the six identified prospective jurors and hearing argument from both sides, the trial court denied defendant's motion" (*ibid*.), first finding that the defense had not made a prima facie case, then adding that based on the prosecutor's explanation, juror questionnaires, and voir dire, the court was satisfied that the exclusions were for valid reasons based on factors other than race. (*Id*. at pp. 173-174.) On review, our high court called the case "a first stage/third stage *Batson* hybrid." (*Id*. at p. 174.) Noting that "we have both the prosecutor's actual reasons and the trial court's evaluation of those reasons," the court likened the case to one in which " 'the question of whether defendant established a prima facie case is moot.' " (*Ibid*.) Accordingly, the court determined to "express no opinion" on the prima facie finding and to "instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing six African-American prospective jurors." (*Ibid*.)

In *Chism*, the defendant objected in separate instances to peremptory challenges against two African-American prospective jurors. (*Chism*, *supra*, 58 Cal.4th at p. 1309.) In both instances, the trial court found the defendant had not made a prima facie showing; yet the court also shared its observations of the prospective jurors' voir dire, in response to the prosecutor's stated reasons, and ultimately indicated that "it was 'confident the D.A. is not using a protected category basis for her peremptories.' " (*Id*. at p. 1312.) In deciding the stage of review, the *Chism* court remarked that "[w]here the trial court

12

determines that defendant did not make a prima facie showing of group bias and also rules on, indicates agreement or satisfaction with, or otherwise passes judgment on the ultimate question of purposeful discrimination, the case is described as a first stage/third stage *Batson*/*Wheeler* hybrid, and the question whether a defendant established a prima facie case of group bias is rendered moot." (*Id*. at p. 1314.) *Chism* observed that for each of the defendant's *Batson/Wheeler* motions, the trial court "ruled ultimately that the prosecutor's stated reasons were genuine and race neutral," and therefore like in *Mills*, the issue of a prima facie showing was rendered moot, justifying appellate review at the third stage of the *Batson/Wheeler* inquiry. (*Ibid*.)

Here, like in *Chism* and *Mills*, the prosecutor's explanation preceded the trial court's finding that Suarez failed to establish a prima facie case *and* the trial court passed judgment on the credibility and sufficiency of the prosecutor's explanation. After hearing unsolicited the prosecutor's reasons for excusing P.L., the trial court reviewed the relevant factors and found there was insufficient information to find a prima facie case. Yet the trial court allowed additional argument and stated that it was "crediting" the prosecutor's explanation that P.L. "gave him a look that he didn't like," and that "can be an appropriate basis for the exercise of a challenge, so I will make that finding. I credit that that happened, and I find legally that that's an acceptable basis for using a challenge."

With this statement, the trial court "indicate[d] . . . satisfaction with . . ." the prosecutor's reason for exercising the strike and found it to be a legally sufficient, nondiscriminatory basis for removing the prospective juror. (*Chism*, *supra*, 58 Cal.4th at p. 1314; see also *People v*. *Booker* (2011) 51 Cal.4th 141, 165 (*Booker*) [applying "first stage/third stage *Batson* hybrid" rubric where trial court found no prima facie showing of discrimination but "the record contains both the prosecutor's reasons and the trial court's evaluation (albeit implicit) of those reasons"].) As previously noted, this step distinguishes the instant case from *Davenport* and from other cases described in *Scott*,

*supra*, 61 Cal.4th at page 386, as undisputed first-stage cases where the trial court refrained from ruling on the validity of the prosecutor's reasons after determining there was no prima facie case.

We find the prosecutor's volunteered statement of reasons for exercising a peremptory challenge against prospective juror P.L., followed by the trial court's consideration and findings on the first and third steps of the *Batson* inquiry, marks a "first stage/third stage *Batson/Wheeler* hybrid." (*Chism*, *supra*, 58 Cal.4th at p. 1314; *Mills*, *supra*, 48 Cal.4th at p. 174.) Accordingly, we conclude that in spite of the trial court's express finding that Suarez did not make a prima facie showing, that issue is moot. We express no opinion whether Suarez established a prima facie case "and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons" for dismissing P.L. (*Mills*, *supra*, at p. 174; *Booker*, *supra*, 51 Cal.4th at p. 165.)

### D.   THE TRIAL COURT DID NOT ERR IN DENYING THE *BATSON/WHEELER* MOTION

"In reviewing the correctness of a trial court's ruling on a *Batson/Wheeler* motion, we consider 'all the circumstances of th[e] case.' " (*People v. Williams* (2013) 56 Cal.4th 630, 653-654, quoting *People v. Reynoso* (2003) 31 Cal.4th 903, 908 (*Reynoso*).) A noncredible reason for the peremptory challenge is sufficient grounds for reversal on appeal. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 485 [prosecution's proffer of "pretextual explanation" gives rise to inference of discriminatory intent].) Suarez argues that the prosecutor offered only noncredible reasons here. We disagree.

The prosecutor stated his reasons for excusing P.L., beginning with "he looked at me and had a very negative smirk on his face. I immediately didn't like the way he was looking at me. I sensed hostility." The prosecutor "ran him out in our computer system" and discovered an individual with the same last, first, and middle names, who appeared to be the "correct age" as P.L. and had sustained a juvenile petition for assault and witness intimidation. The prosecutor admitted, "I don't know if it's the same person . . . ." The

14

prosecutor also proffered P.L.'s wife's position as a probation counselor, because "they tend to be on the protective side when it comes to a lot of the youth who are involved in criminal street gangs."[6] Thus, the prosecutor volunteered three reasons for exercising the peremptory challenge: P.L.'s "smirk" or expression of "hostility"; the juvenile record that corresponded to P.L.'s first, middle, and last names; and P.L.'s wife's job as a probation counselor for youth.

As to the smirk, Suarez concedes that a facial expression may be a legitimate basis for excusing a prospective juror. He asserts that it was not offered for that purpose here, however, but solely as a reason for running P.L.'s background. We find as a preliminary matter that the prosecutor's explanation for running the background "because of the way [P.L.] was glaring" at him did not preclude the facial expression from being offered as an independent reason for the peremptory challenge. This is consistent with the trial court's interpretation of the prosecutor's decision as arising directly from the hostile look. The court not only credited the fact "that [P.L.] gave him a look that he didn't like" and that "that happened," but also "that that's an acceptable basis for using a challenge."

Suarez also argues that a facial expression is not a credible reason to believe a person has a criminal record and is therefore pretext. We are not persuaded, given that "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*Lenix*, *supra*, 44 Cal.4th at p. 613; *Jones*, *supra*, 57 Cal.4th at p. 917.) *Wheeler* explained that a peremptory challenge "may be predicated on a broad spectrum of evidence suggestive of juror partiality" ranging "from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) A perceived smirk or hostile expression certainly falls within this category of "less tangible evidence of potential bias"

_____

[6] Suarez was 23 years old at the time of his offenses.

15

that may stem from "no more than . . . upon entering the box the juror may have smiled at the defendant, for instance, or glared at him." (*Ibid.*)

Having found that P.L.'s smirk was one of the prosecutor's stated reasons for excusing P.L., the proper focus of our inquiry " 'is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' " (*Jones*, *supra*, 57 Cal.4th at p. 917, quoting *Reynoso*, *supra*, 31 Cal.4th at p. 924.) The trial court's finding in this regard is " 'a pure issue of fact' " that we accord significant deference on appeal. (*Miller-El*, *supra*, 537 U.S. at p. 339, quoting *Hernandez*, *supra*, 500 U.S. at p. 364.) "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." (*Miller-El*, *supra*, at p. 339.)

Whether P.L. gave the prosecutor the described look cannot be discerned from "a cold record." (*Lenix*, *supra*, 44 Cal.4th at p. 621.) That is why we defer to the trial court's assessment of the prosecutor's credibility. " 'So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Lenix*, *supra*, at p. 614, quoting *People v. Burgener* (2003) 29 Cal.4th 833, 864.)

We find no indication that the trial court erred in assessing the prosecutor's demeanor, the reasonableness or improbability of his explanations, or "whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El*, *supra*, 537 U.S. at p. 339.) Beginning with the prima facie case, the trial court scrutinized each relevant factor, including if P.L. was a member of a cognizable group, if he shared that group with the defendant or victims, whether the pattern or timing of the peremptory challenge provided an inference of purposeful discrimination, and whether the prosecutor asked questions of the prospective juror. The trial court curtailed its comments on the prosecutor's stated reasons but demonstrated no less a sincere and reasoned effort to

16

evaluate those reasons. And by drawing on prior experience as a trial lawyer, the trial court properly considered the persuasiveness of the prosecutor's justification in relation to "accepted trial strategy." (*Ibid*.) "In assessing credibility, the court . . . may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix*, *supra*, 44 Cal.4th at p. 613, citing *Wheeler*, *supra*, 22 Cal.3d at p. 281.)

Nor do we find support for Suarez's contention that the prosecutor's proffered reasons were implausible and untrue.[7] While the prosecutor could have asked P.L. neutral questions common to voir dire—such as about prior interactions with law enforcement—that might have indicated if P.L. was the person with the juvenile record and if his wife's work would influence him as a juror, the failure to do so is not alone determinative of his credibility. The California Supreme Court in *People v. Jones* (2011) 51 Cal.4th 346, rejected a similar argument, explaining that "[a] party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge." (*Id*. at p. 363.) Suarez cites *Miller-El v. Dretke* (2005) 545 U.S. 231, in which the United States Supreme Court discredited the state's explanation in support of its use of a peremptory challenge as "reek[ing] of afterthought" given that "the prosecution asked nothing further" of the juror about the subject of the state's alleged concerns. (*Id*. at p. 246.) But in that case, failing to examine the prospective juror on the topic of concern was only one of a multitude of actions by the state that together offered evidence "to a clear and convincing degree" that the prosecution had engaged in purposeful discrimination. (*Id.* at p. 266.)

---

[7] One could infer from the heated exchange between defense counsel and the prosecutor regarding the prosecutor's purported use of the derogatory word "esé" during the recess that something untoward had transpired. However, because defense counsel subsequently retreated from her argument to that effect, and the trial court did not comment on the exchange or follow up on the misconduct issue, we draw no inferences from the exchange and decline to speculate about what occurred.

Here, we cannot extract the same conclusion from the prosecutor's failure to examine the prospective juror, particularly where the prosecutor was forthright that he did not know if P.L. was the person with the juvenile record and believed that in not questioning him, he was adhering to confidentiality requirements. Although the trial court critiqued the prosecutor for his failure to ask P.L. "any questions *at all* about his views on things" (italics added), it did not change its finding, suggesting the prosecutor remained credible despite what could be viewed as poor trial tactic. Further, as the People point out, the prosecutor did not ask questions of seven other members of the venire panel, including three who ultimately served on the jury. This makes the failure to question P.L. unexceptional.

In sum, we find nothing in the record to indicate that the trial court failed to make " 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " (*Lenix*, *supra*, 44 Cal.4th at p. 614) or otherwise relied on improper or contradictory evidence. This is not a case in which the record reveals contradictions in the prosecutor's explanation in response to a *Batson/Wheeler* motion. (See, e.g., *People v. Long* (2010) 189 Cal.App.4th 826, 845 [deference to trial court's findings on the prosecutor's reasons is inappropriate where "at least one of those reasons is demonstrably false"]; *Silva*, *supra*, 25 Cal.4th at p. 385 [prosecutor "misrepresented the record of voir dire," yet trial court failed "to point out inconsistencies and to ask probing questions"].) And it is not a case in which the trial court accepted wholesale the prosecutor's explanation without comment or finding. (See, e.g., *Snyder v. Louisiana*, *supra*, 552 U.S. at p. 479 [reviewing court "cannot presume that the trial judge credited the prosecutor's assertion" about juror's demeanor where judge "simply allowed the challenge without explanation"].) The trial court's critical consideration of the prosecutor's stated reasons, juxtaposed against his failure to question P.L., is clear from the record.

We need not weigh what Suarez contends on appeal are newly-proffered explanations for the prosecutor's peremptory challenge against P.L. Our review is

confined to the explanation provided to the trial court and the trial court's assessment at the time.[8]  (See *Lenix*, *supra*, 44 Cal.4th at p. 624 ["trial court's finding is reviewed on the record as it stands at the time the *Wheeler*/*Batson* ruling is made"].)  We find on that record that substantial evidence supports the trial court's finding that the prosecutor's nondiscriminatory reasons were genuine and credible.

**E.  A NEW HEARING ON THE *BATSON*/*WHEELER* MOTION IS NOT REQUIRED**

Suarez argues that because the prosecutor's reference to P.L.'s smirk was pretextual, and the trial court did not make express findings on the other two stated reasons—P.L.'s possible juvenile record, and his wife's position as a youth counselor for the probation department—the matter should be remanded for a new hearing.

Suarez relies on *People v. Tapia* (1994) 25 Cal.App.4th 984 (*Tapia*), in which the appellate court ruled that error in the trial court's *Wheeler* analysis justified a limited remand in order for the trial court to evaluate the genuineness and sufficiency of the prosecution's explanation for the peremptory challenges.  (*Id.* at pp. 1031-1032.)  But in *Tapia*, the trial court applied an incorrect " 'good cause' " standard to the prosecutor's use of peremptory challenges (*id.* at p. 1014) and failed to note an "obvious contradiction" between the prosecutor's representation of a prospective juror's voir dire responses and the actual record.  (*Id.* at p. 1019.)  This rendered the prosecutor's reasons " 'either implausible or suggestive of bias,' " and justified " ' "further inquiry on the part

---

[8] Suarez has not requested a comparative juror analysis of P.L. with that of the non-Hispanic jurors whom the prosecutor did not challenge (see, e.g., *Lenix*, *supra*, 44 Cal.4th at p. 607 ["Comparative juror analysis is evidence that . . . must be considered when reviewing claims of error at [*Batson*/*Wheeler*]'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons"]) and has not provided more than a cursory summary of statistical evidence that could serve as additional support for his claim that the prosecutor's peremptory challenge to P.L. was motivated by group bias (cf. *Chism*, *supra*, 58 Cal.4th at pp. 1315-1316 [assessing defendant's statistical showing to support his claim at third-stage *Batson*/*Wheeler* review that the prosecutor's peremptory challenges were racially motivated]).

19

of the trial court" [citation], followed by a "sincere and *reasoned*" effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial.' " (*Ibid.*, quoting *People v. Turner* (1986) 42 Cal.3d 711, 727-728.)

As set forth above (*ante*, section II.D), evidence of such failure to evaluate the genuineness and sufficiency of the prosecutor's stated reasons is not present here. Despite having found no prima facie case, the trial court considered the prosecutor's stated reasons and expressly found, as to the first stated reason, that it was credible and sufficient. As to the other stated reasons, Suarez contends the trial court failed to perform an adequate review and erred, like in *Tapia*, by its " 'apparent acceptance of those reasons at face value.' " (*Tapia*, *supra*, 25 Cal.App.4th at p. 1019.)

Suarez's argument falls short because the absence of specific findings related to the two additional reasons does not indicate, without more, that the trial court failed to apply a sincere and reasoned effort to evaluate the prosecutor's stated reasons. Case authority instructs that a trial court may be required to probe justifications and make detailed findings when the record reveals implausible or unsupported explanations by the party exercising the peremptory challenge. "[W]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, *supra*, 25 Cal.4th at p. 386.) But where "the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible (*Silva*, *supra*, 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed

20

findings regarding the reasons for the exercise of each such peremptory challenge."
(*Reynoso*, *supra*, 31 Cal.4th at p. 929.)

The record on Suarez's motion fits comfortably in this latter category. The trial court invited argument from both sides before making a finding as to the first stated reason. Though the trial court did not ask *why* the prosecutor did not examine P.L. in voir dire, the issue was not missed or ignored. (See *Booker*, *supra*, 51 Cal.4th at p. 165 ["the record contains both the prosecutor's reasons and the trial court's evaluation (albeit implicit) of those reasons"].) The trial court was fully apprised of this fact and noted it when it called the prosecutor's failure to ask any questions "the more concerning part." Further findings or detailed comments were not required where the reasons were neither inherently implausible nor unsupported by the record. In fulfilling its duty to conduct a sincere and reasoned evaluation, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*Reynoso*, *supra*, 31 Cal.4th at p. 919.) Suarez argues that unlike in *Reynoso*, there is evidence in the record that conflicts with the presumption that the trial court properly evaluated the prosecutor's reasons. We have rejected that argument. We find the trial court's analysis of Suarez's *Batson/Wheeler* motion was adequate, and no further consideration of the prosecutor's explanation is required.

### III.  SENTENCING

Suarez challenges several aspects of his sentence, arguing that (1) the sentence on count 4, being a felon in possession of a firearm, violates the proscription against multiple punishments for a single act (§ 654), (2) the trial court failed to specify the statutory bases for the fines imposed as a condition of probation, and (3) the trial court failed to award presentence conduct credits. While the People disagree that the sentence on count 4 violates the ban on multiple punishments, they raise a separate issue of error

21

related to the stay of punishment for count 2, the brandishing offense. The People concede Suarez's latter two arguments.

## A. RELEVANT PROCEEDINGS

Suarez suffered convictions for three firearm-related offenses—assault with a firearm, with an enhancement for personal use of a firearm (count 1), brandishing a firearm (count 2), and illegally possessing a firearm (count 4)—and one drug-related offense for possession of methamphetamine (count 5). He received an aggregate prison sentence of seven years eight months. The trial court imposed the midterm of three years for the assault with a firearm conviction (count 1), plus the midterm of four years on the firearm use enhancement, and a consecutive sentence of one-third the midterm of eight months for the drug possession conviction (count 5), which was later reduced to a misdemeanor pursuant to Proposition 47.

As to the brandishing conviction (count 2), the court determined that section 654 applied, stating that "under 654 of the Penal Code, the brandishing is—although he can be convicted of it, he cannot be punished for it. I'm going to stay any additional punishment on that charge, given the fact that the brandishing and the assault were the same conduct." The trial court did not impose a sentence as to count 2.

As to the firearm possession conviction (count 4), the trial court stated: "Number 4 is the possession of a firearm by a felon, 29800(a)(1) of the Penal Code, and that was close to being 654. It's certainly part—all part of the same transaction and did not have separate objectives and, therefore, is appropriately sentenced concurrent. So that will be midterm of two years, concurrent with the sentence in Count 1."

The trial court suspended execution of the prison sentence and placed Suarez on three years of formal probation. The court ordered, as a condition of probation, that Suarez serve one year in county jail for his conviction on count 1, another year for his conviction on count 4, and a third year for his conviction on count 5, for a total of three years.

After the sentencing, Suarez brought a motion pursuant to section 654 to stay his sentence on the firearm possession conviction (count 4). At the hearing, defense counsel mistakenly asserted that the trial court had imposed and stayed a prison sentence on count 4 pursuant to section 654, but upon suspending execution of sentence and placing Suarez on probation, had ordered Suarez to serve one year in jail. She objected to the one-year jail term for count 4, explaining: "The Court found it to be a 654 count as to the prison commitment. So, therefore, it should be a 654 count as to the probation commitment."

The prosecutor disagreed that the trial court had applied section 654 to count 4. He argued that the evidence at trial had established the conduct underlying count 4 was not the same as the assault and brandishing: "The Court will recall there was evidence on Facebook of [Suarez] being in possession of a firearm, attempting to sell that firearm; and also remarks in his cell phone text messages talking about 'staying strapped' and having a firearm at all times. [¶] So I don't believe it is 654." The prosecutor also argued that the objection pursuant to section 654 was waived by the Suarez's failure to raise the issue at sentencing.

The trial court did not recall declaring the sentence on count 4 stayed pursuant to section 654. The court explained, "I think I ordered that—in the prison commitments, that . . . Count 4 be served concurrent, based on the fact that they were closely related in terms of conduct, but I don't know . . . I'm not seeing a reflection in the minutes." The court concluded that it was noting the objection "but I'm not changing the order . . . ." Defense counsel renewed her claim, stating "I would at this time request and argue to the Court [that] it is 654. Probation notes it as 654 in their probation report, and it is one course of conduct . . . pursuant to Penal Code 654." The trial court denied the motion.

23

### B. MULTIPLE PUNISHMENTS

#### 1. Section 654[9]

" 'Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct.' (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) It is the defendant's intent and objective that determines whether the course of conduct is indivisible. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.) Thus, ' "[i]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." ' (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1297, quoting *People v. Harrison* (1989) 48 Cal.3d 321, 335.)" (*People v. Le* (2006) 136 Cal.App.4th 925, 931 (*Le*).) But "if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551; *People v. Harrison*, *supra*, at p. 335.)

A defendant's intent and objective are factual matters for the trial court to determine. (*People v. Palmore*, *supra*, 79 Cal.App.4th at p. 1297.) "We must affirm if substantial evidence supports a trial court's express or implied determination that punishment for crimes occurring during a course of conduct does not involve dual use of facts prohibited by section 654." (*Ibid.*)

#### 2. The Trial Court's Refusal to Stay the Sentence on Count 4

As a preliminary matter, we agree with Suarez that his trial counsel's failure to object to the sentence on count 4 does not forfeit his challenge on appeal. If a court

---

[9] Section 654 states in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

imposes multiple punishments in violation of section 654, it "acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence" that can be challenged for the first time on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17; *Le*, *supra*, 136 Cal.App.4th at p. 931.) The People do not dispute this point.

Next we address whether the two-year concurrent prison sentence on count 4, and the consecutive, one-year county jail term imposed as a condition of probation on that count, violate section 654's ban on multiple punishments. In Suarez's view, the trial court at sentencing made a factual finding that count 4—illegally possessing a firearm, arose from the same course of conduct with the same criminal objective as counts 1 and 2—assault with a firearm and brandishing a firearm. He contends that substantial evidence supports this finding, so the trial court erred as a matter of law when it imposed the concurrent sentence and later denied Suarez's motion to stay the sentence.

Suarez's argument hinges on the following statement by the trial court at the sentencing hearing: "Number 4 . . . was close to being 654. *It's certainly part—all part of the same transaction and did not have separate objectives* and, therefore, is appropriately sentenced concurrent." (Italics added.) Standing alone, the italicized portion suggests a factual finding that count 4 occurred as part of an indivisible course of conduct, sharing the same objective, as the assault with a firearm and brandishing offenses. But this standalone statement does not hold sway when viewed in context of the entire record and the trial court's rulings.

We note from the trial court's stay of punishment on count 2, the brandishing offense, that the court plainly understood the application of section 654. We also note that immediately after staying punishment on count 2, the trial court stated that count 4 "*was close to being 654 . . . .*" (Italics added.) This contradicts the subsequent statement that count 4 was "part of the same transaction and did not have separate objectives," hampering Suarez's assertion that the court made a factual finding in favor of section 654. Any doubt in the record, moreover, is resolved by the court's ruling on

25

Suarez's postsentence motion to stay the sentence on count 4. The trial court accurately recalled that it had ordered count 4 to "be served concurrent, based on the fact that they were closely related in terms of conduct . . ." and expressly rejected defense counsel's argument that "it is one course of conduct."

The trial court's finding that the conduct in count 4 was "closely related" to that of the other firearm related offenses is consistent with its observation at the sentencing hearing that count 4 "was close to being 654," which may justify a concurrent sentence but does not equal a singular intent and objective within the meaning of section 654. To the extent the trial court's decision on the applicability of section 654 to count 4 lacked a clear factual basis, we find "implicit in its imposition of concurrent sentences" and in its refusal to change that determination "a finding that the firearm possession was a separate and distinct offense." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1147 (*Jones*).)

We turn to whether substantial evidence supports the trial court's determination that section 654 did not preclude the concurrent two-year prison sentence, or the consecutive one-year jail term, for count 4. The People cite *Jones* for the proposition that "when an ex-felon commits a crime using a firearm, and arrives at the crime scene already in possession of the firearm, it may reasonably be inferred that the firearm possession is a separate and antecedent offense, carried out with an independent, distinct intent from the primary crime." (*Jones*, *supra*, 103 Cal.App.4th at p. 1141.) The People point to trial testimony that Suarez drove by the Alba's residence at least once just before the assault, from which it could reasonably be inferred that he was already in possession of the firearm, and to evidence that he discharged the firearm after the assault when he drove to the end of the cul-de-sac.[10] The People also refer to evidence from Suarez's cell

---

[10] Although the jury did not reach a verdict on the negligent discharge count (count 3), the People assert, and Suarez does not dispute, that the court may rely on facts underlying verdicts of acquittal in making sentencing choices. (See *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340 ["in the absence of some circumstance 'foreclosing'
(continued)

phone of YouTube searches from about a month prior to the date of the offenses related to guns and gun violence, messages that showed Suarez was trying to buy a gun, and testimony explaining that gang members "stay strapped" for self-defense. The People argue that these facts raise a reasonable inference that Suarez was in possession of the firearm when he first drove past the Alba's home, that he possessed the firearm for protection as a gang member, and that he did not form the intent to assault Brian with the firearm until he saw Brian standing on the sidewalk.

Suarez responds that the cited evidence raises only speculation, and nothing in the record shows that Suarez had a separate objective in possessing the firearm or had possessed the firearm on any other occasion. He was not in possession of a firearm at the time of his arrest, nor was a firearm associated with him ever found. Suarez argues the evidence supports an inference of possession " ' "only in conjunction with the primary offense . . . ." ' " (*Jones*, *supra*, 103 Cal.App.4th at p. 1143.)

The California Supreme Court's decision in *People v. Bradford* (1976) 17 Cal.3d 8 (*Bradford*) is instructive. In *Bradford*, a highway patrol officer stopped the defendant for speeding, and the defendant "wrested the officer's revolver from him," then fired five shots at the officer and a passerby. (*Id.* at p. 13.) The court considered the applicability of section 654 to the defendant's convictions for assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon, and articulated the following standard: " 'Whether a violation of [former] section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been

_____

its sentencing discretion . . . , a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts"].)

27

approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense.' " (*Bradford*, *supra*, at p. 22.) Explaining that possession of the revolver "was not 'antecedent and separate' from [the defendant's] use of the revolver in assaulting the officer" (*ibid.*), the high court concluded that section 654 prohibited punishment for both convictions. (*Bradford*, *supra*, at pp. 22-23.)

Here, we find the evidence adduced at trial supports a reasonable inference that Suarez was in possession of the firearm at least by the time that he passed in front of the Alba's house and confronted the brothers, and immediately following that confrontation, when the firearm discharged somewhere down the street. Unlike in *Bradford*, there is no evidence that Suarez gained possession of the firearm "only at the instant of committing" the other offenses. (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412 (*Ratcliff*).) As expressed in *Ratcliffe*, "[a] violation of [former] section 12021, subdivision (a) is a relatively simple crime to commit: an ex-felon who owns, possesses, or has custody or control of a firearm commits a felony. *Implicitly*, *the crime is committed the instant the felon in any way has a firearm within his control.*" (*Id*. at p. 1410, fn. omitted.) Thus where the defendant used a handgun in two robberies separated in time by about an hour and a half, and was in possession of the gun at the time of his arrest half an hour later, "[a] justifiable inference . . . is that defendant's possession of the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes. Section 654 therefore does not prohibit separate punishments." (*Id*. at p. 1413.)

The time frame here is more compressed than in *Ratcliff*, and Suarez was not in possession of the gun at the time of his arrest several days later, but the same reasoning applies. In order to commit the assault with a firearm and brandishing offenses, Suarez must have possessed the firearm as he approached the victims' residence while alone in his vehicle. He likewise must have possessed the firearm in the minutes following those

28

offenses in order to discharge the firearm, causing a booming sound to which several witnesses testified. As the court articulated in *Jones*, *supra*, 103 Cal.App.4th at page 1147, it "strains reason to assume" that Suarez did not have possession of the firearm for some period before displaying and pointing the gun at the victim, considering the evidence that he was driving alone in a vehicle. Like in *Jones*, in which the defendant received concurrent sentences for shooting at an inhabited dwelling and being a felon in possession of a firearm (*id*. at p. 1142), Suarez "necessarily must have had either actual or constructive possession of the gun while riding in the car, as evidenced by his control over and use of the gun during the [assault]." (*Id*. at p. 1147.)

We conclude that substantial evidence supports the trial court's determination that Suarez's conviction for being a felon in possession of a firearm was "close" but ultimately divisible from the other firearm-related offenses. Accordingly, we find the two-year concurrent prison sentence on count 4, as well as the one-year jail term ordered as a condition of probation, do not violate section 654. We likewise find any fines imposed in connection with count 4 are not precluded by section 654.

### 3. The Trial Court's Failure to Impose a Sentence as to Count 2

The trial court found that section 654 precluded punishment for count 2, the misdemeanor brandishing conviction, explaining that "the brandishing and the assault were the same conduct." There is no dispute over this determination. But the People assert that the trial court failed to properly apply section 654 when it stated, "I'm going to stay any additional punishment on that charge . . ." and did not impose a sentence first. The minute order contains no mention of a sentence or stayed punishment as to count 2.

In *People v. Alford* (2010) 180 Cal.App.4th 1463, the Court of Appeal clarified the proper way to implement section 654. It explained, "[W]hen a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence." (*People v. Alford*, *supra*, at p. 1466.) Failure to impose a sentence on all counts can lead to procedural difficulties, such as "if

the nonstayed sentence is vacated, either on appeal or in a collateral attack on the judgment, no valid sentence will remain." (*Id*. at p. 1469.) The California Supreme Court has confirmed this implementation of section 654. (*People v. Duff* (2010) 50 Cal.4th 787, 796 ["when a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence . . . ."].)

Because the trial court found that section 654 applies to count 2, but failed to impose sentence and stay execution of that sentence, we will remand the matter in order for the trial court to correct this limited sentencing issue.

### C. FINES AND FEES

The trial court imposed a fine of $2,535, calculated as the sum of $1,095 for count 5 and $720 each for counts 1 and 4, as well as a $2,100 restitution fine, and other specified fees. The minute order reflects a $2,535 lump sum fine "as directed by Probation." The probation/conditional sentence order reflects only the amounts stated on the record. The trial court's oral pronouncement and the written orders do not specify the statutory bases for the fines. The parties agree that this omission requires correction.

"Although . . . a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. All fines and fees must be set forth in the abstract of judgment." (*People v. High* (2004) 119 Cal.App.4th 1192, 1200 (*High*).) Moreover, "[a] detailed description of the amount of and statutory basis for the fines and penalty assessments imposed would help the parties and the court avoid errors in this area." (*People v. Hamed* (2013) 221 Cal.App.4th 928, 939 (*Hamed*).)

*Hamed* recognized several ways for a trial court to perform this duty. "A trial court could recite the amount and statutory basis for any base fine and the amounts and statutory bases for any penalty assessments on the record, as *High* suggests should be done. (*High*, *supra*, 119 Cal.App.4th at p. 1200.) Or, in cases where the amounts and statutory bases for the penalty assessments have been set forth in a probation report, a

30

sentencing memorandum, or some other writing, the court could state the amount and statutory basis for the base fine and make a shorthand reference in its oral pronouncement to 'penalty assessments as set forth in the' probation report, memorandum, or writing as authorized in [*People v. Sharret* (2011) 191 Cal.App.4th 859] and [*People v. Voit* (2011) 200 Cal.App.4th 1353]." (*Hamed*, *supra*, 221 Cal.App.4th at pp. 939-940.)

This failure to specify the statutory basis for each fine is a "legal error[] at sentencing" that can be reviewed on appeal " 'regardless of whether an objection or argument was raised . . . .' " (*People v. Smith* (2001) 24 Cal.4th 849, 852.) On remand, the trial court shall specify the appropriate statutory bases for the fines imposed.

D.    **PRESENTENCE CONDUCT CREDITS**

The trial court suspended execution of the prison sentence, placed Suarez on formal probation, and ordered three years in county jail as a condition of probation. The probation report listed Suarez's total number of custody credits as 32 days based on his actual time in custody. At the sentencing hearing, the trial court asked for the number of credits. Defense counsel responded that "probation has them calculated as 32 days." The trial court accordingly awarded 32 days of credit against Suarez's three-year jail term.

The parties agree that the trial court erroneously failed to award presentence conduct credits. Defense counsel's failure to object on that ground does not forfeit the issue on appeal because awarding presentence conduct credit is not a discretionary matter. (*People v. Goldman* (2014) 225 Cal.App.4th 950, 961 (*Goldman*) ["only challenges to discretionary sentencing choices are forfeited by failure to object"]; see also *People v. Scott*, *supra*, 9 Cal.4th at p. 353 [waiver doctrine applies to claims involving "trial court's failure to properly make or articulate its discretionary sentencing choices"].) Thus, in *Goldman* the court held that the defendant's failure to object at the time of sentencing did not result in forfeiture of his claim to presentence conduct credits to which he was entitled under section 2933.1. (*Goldman*, *supra*, at pp. 961-962.)

31

Section 2933.1, subdivision (c) generally limits accrual of presentence credits to 15 percent of actual time served for a defendant convicted of a violent felony within the meaning of section 667.5, subdivision (c). (*People v. Daniels* (2003) 106 Cal.App.4th 736, 739.) This limitation, however, "only applies when the judgment results in the defendant's incarceration in state prison, and not when a defendant is on probation even if he or she was convicted of a section 667.5, subdivision (c) felony." (*Ibid.*, citing *In re Carr* (1998) 65 Cal.App.4th 1525, 1535-1536 [defendant placed on probation is not subject to § 2933.1 and is entitled to full award of presentence conduct credits].)

Here, the jury's true finding on the personal use of a firearm enhancement (§ 12022.5) renders Suarez's assault with a firearm conviction (count 1) a "violent felony" within the meaning of section 667.5, subdivision (c)(8). If the trial court had not suspended execution of Suarez's prison sentence, his presentence conduct credits would be limited to 15 percent under section 2933.1, subdivision (c). But in accordance with the reasoning set forth in *People v. Daniels*, *supra*, 106 Cal.App.4th at page 741 and *In re Carr*, *supra*, 65 Cal.App.4th at page 1536, because Suarez received a term of probation, the 15 percent limitation does not apply. We find that Suarez is entitled to full presentence conduct credits pursuant to section 4019, which governs the calculation of credits when a defendant is committed to the county jail as a condition of probation after suspension of execution of sentence. (§ 4019, subd. (a)(2).) On remand, the trial court shall recalculate the award of presentence credits accordingly.

## IV.  DISPOSITION

The judgment is reversed and remanded for resentencing. The trial court is directed to correct the following issues:

(1) to impose a sentence on count 2, brandishing a firearm (Pen. Code, § 417, subd. (a)(2)), and stay execution of that sentence pursuant to Penal Code section 654;

(2) to specify the statutory bases for the fines imposed; and

(3) to recalculate the award of presentence credits, applied against Suarez's remaining county jail term, in accordance with Penal Code section 4019.

The trial court is directed to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Grover, J.


People v. Suarez
H041111